**Albert N. SHAHADI, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent (two cases).**

**Albert N. SHAHADI, and Josephine Shahadi, Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**Nos. 12802–12804.**

United States Court of Appeals Third Circuit.

Argued March 17, 1959.

Decided April 16, 1959.

Rehearing Denied May 11, 1959.

George P. Walker, Camden, N. J., Robert M. Taylor, Philadelphia, Pa., for petitioners.

Joseph Kovner, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, A. F. Prescott, Attys., Department of Justice, Washington, D. C., on the brief), for respondent.

Before McLAUGHLIN and HASTIE, Circuit Judges, and MORRILL, District Judge.

MORRILL, District Judge.

Tax deficiencies, fraud penalties and underestimation penalties were assessed against petitioner Albert N. Shahadi for the years 1944–1949 inclusive and against him and his wife, Josephine, for the year 1950. Appeals heard by the Tax Court as a consolidated group resulted in the Commissioner being sustained and the petitioners are now before us in a consolidated review after a denial by the Tax Court of their motion for reconsideration.

The deficiencies and additions amounted to $74,599.29 as follows:

| Year | Deficiency | Additions to Tax Sec. 293(b) (Fraud) | Sec. 294(d) (Under-estimation) |
|------|-----------|--------------------------------------|-------------------------------|
| 1944 | $ 4,472.04 | $2,236.02 | $ None |
| 1945 | 9,757.73 | 4,878.87 | 658.98 |
| 1946 | 7,052.82 | 3,526.41 | 423.17 |
| 1947 | 4,679.09 | 2,339.55 | 210.77 |
| 1948 | 5,464.99 | 2,732.50 | 341.21 |
| 1949 | 15,005.87 | 7,502.94 | 974.97 |
| 1950 (Joint) | 1,461.34 | 730.67 | 86.51 |
| 1951 (Joint) | None | None | 62.84 |

On the basis of a net worth computation, it was found that there was a failure to report income during 1944–1950 inclusive in the amount of $102,277.74.

The principal questions are: Was the use of the net worth method justified under § 41[1] of the Internal Revenue Code of 1939?[2] Did the evidence justify the finding of deficiencies? Were the deficiencies due to "fraud with intent to evade tax" under § 293(b) of the Code?[3] Were there false or fraudulent returns with intent to evade with reference to

1. § 41 I.R.C. "The net income shall be computed * * * in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if * * * the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. * * *"

2. All Code references are to the Internal Revenue Code of 1939, 26 U.S.C.

3. § 293(b) I.R.C. "If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum * * * shall be assessed * * *."

the years 1944–1947 so that under § 276 (a) the limitations statute was rendered inapplicable? Was there substantial underestimation of taxes to justify invoking the additions imposed under § 294(d) (2)? Was there error in denying petitioners' motion for rehearing?

Admitted to practice in New Jersey in 1923, the husband petitioner worked in a law office for about five years, receiving a salary of $25–$50 per week plus what he made on his own cases. During the period 1938–1951, the petitioner conducted his own law practice and additionally held certain appointive positions as follows:

| Year | Position | Salary |
|------|----------|--------|
| 1938 | Recorder | $2,080.00 |
| 1939 | Recorder | 4,260.00 |
| 1940 | Recorder | 4,500.00 |
| 1941 | Recorder | 4,500.00 |
| 1942 | Recorder | 4,574.88 |
| 1943 | Recorder | 4,699.84 |
| 1944 | Recorder and Commissioner | 5,006.19 |
| 1945 | Commissioner | 5,250.00 |
| 1946 | Commissioner | 5,250.00 |
| 1947 | Commissioner | 5,250.00 |
| 1948 | Commissioner | 5,250.00 |
| 1949 | Commissioner | 5,250.00 |
| 1950 | Commissioner | 1,312.50 |
| 1950 | County Solicitor | 5,312.00 |
| 1951 | County Solicitor | 7,900.00 |

In his private practice he was associated with one Miller who did petitioner's trial work for which Miller received a portion of petitioner's legal fees. Only the net fees thus received by petitioner were recorded in his books and reported as income.

When revenue agents first interviewed petitioner in 1951, he could produce no books or records for the years through 1948 save certain checks issued in 1948. The other records had been destroyed "because I thought I would never have any use for them." He did have a form for the next three years—ledger sheets— which assertedly reflected his income and expenditures, he having "figured from what I understood that that was suffi-

cient to keep." Cancelled checks were also available. The agents found petitioner's subsidiary files incomplete and lacking in substantiation as to income and expenditures for the years 1949 and 1950; and his bank deposits for the years 1946–1948 inclusive showed deposits in excess of reported gross income. When confronted with this state of affairs, petitioner suggested that the discrepancies might be attributed to his financial arrangement with Miller, but a subsequent examination of Miller's records contributed not a bit toward the resolution of the problem. The net worth and expenditures method of reconstucting income was thereupon adopted by the agents.

For trial purposes a stipulation was entered into with respect to petitioners' assets, liabilities, living expenses, net worth and annual increase in net worth plus living expenses as of 31 December 1943 and as of 31 December of each taxable year from 1944 through 1950. Exceptions and reservations to the stipulation were noted by petitioners, these pertaining to an item of furs and jewelry and an item of cash. As to the first item, petitioners contended that these assets were received during the net worth period as gifts from Mrs. Shahadi's mother; as to the second item, the right was reserved to submit evidence concerning the amount of cash on hand as of 31 December 1943 and throughout the subsequent years. A condensation of the stipulation, plus the amounts of adjusted gross income the petitioners reported on their returns for the years 1944 through 1950, and the total unreported income as determined by the respondent, is marked Appendix I.

The value of the furs appears in the net worth statement as follows:

| | |
|---|---|
| 31 December 1944 | $ 2,010.00 |
| 31 December 1945 | " |
| 31 December 1946 | " |
| 31 December 1947 | 7,530.00 |
| 31 December 1948 | " |
| 31 December 1949 | 11,530.00 |
| 31 December 1950 | 12,825.00 |

The gifts of jewelry and furs are alleged to have been made in 1944, 1947, 1950 and 1951. In an affidavit petitioner Josephine Shahadi had stated that her mother had given her a fox jacket and a neckpiece of three baum marten skins. In testifying later before the Tax Court, she admitted the falsity of this statement and testified that she had purchased the two items herself. As to the other items of furs and jewelry, she said her mother gave them to her, but her proof in this regard was insubstantial and the court may well have disbelieved her on *falsus in uno, falsus in toto.*

As to the reservation about cash, petitioner Albert Shahadi told the agents in 1951 that he had a cash hoard[4] in a safe deposit box, which represented savings of many years, but he did not disclose the amount. At the end of 1952, he told the agents he had accumulated $70,000 in cash in the deposit box derived from the following sources: $30,000 in cash from his mother in December 1924 or January 1925; $20,000 in cash from his father late in 1931; and $20,000 in cash from earnings, gifts and inheritances over a period of years prior to 1944. He complains about the net worth computation and the determined deficiencies in that the computation failed to take into account this accumulation of cash prior to 31 December 1943.

As to the cash hoard of $70,000, the Tax Court found it "utterly incredible." He claimed a $30,000 cash gift from his mother, Mary, in December 1924 or January 1925. She never filed a tax return. She died in March 1927, possessed of personal property in the amount of $300 and real property in the amount of $4,000. Her son, the petitioner here, was her executor. Her husband, in Europe in 1914, was interned there during World War I until 1920. Mary sent him money during that period. She also supported a Mrs. Saseen and her six children at least through 1920, after Mr. Saseen had deserted them. This support included college expenses for two years for one of the Saseen children, and expenses for the petitioner for about one and a half years at the same college. In May 1923, she purchased a house for about $10,000 subject to a $4,000 mortgage on which she paid interest at the rate of 6% per annum. These facts alone repel a belief that in December 1924, she had a $30,000 cash hoard to give to her son.

The cash gift of $20,000 was allegedly made late in 1931 by his father, Nicola, who was adjudicated a bankrupt on 15 April 1929, his schedules showing stock in trade valued at $564.05 and cash in two banks totalling $24.82. Between the date of the father's discharge in bankruptcy in August 1929 and the date of the cash gift, business conditions in this country were not favorable for the rapid accumulation of money, to say the least. The father died in November 1947 and his son, the petitioner, was his executor. The petitioner advised the State Transfer Inheritance Tax Bureau, in writing, that the decedent had not made any transfer without full consideration of a material part of his estate more than two years prior to death. Nicola was also delinquent in his federal income tax returns, none having been filed 1913–1926 inclusive, 1929 and 1931–1947 inclusive. It would require a great deal of credulity to put stock in the claim that the father had made this large gift at the time designated.

But there are other facts that compel a rejection of the cash hoard story. Within a few weeks prior to the bankruptcy, the father borrowed $725 on a life insurance policy. Petitioner was a tax delinquent, on the realty inherited from his mother, for seven years between 1928–1937. In 1944, the petitioner purchased certain stocks and bonds for $5,500, borrowing $3,500 for this purpose, and the next month sold

---

4. The existence of a substantial amount of cash on hand at the starting point of the net worth figures is a "favorite defense." Holland v. United States, 348

U.S. 121, 127, 75 S.Ct. 127, 99 L.Ed. 150; Schwarzkopf v. Commissioner, 3 Cir., 246 F.2d 731, 734.

some of his United States Savings Bonds to repay the loan. In January 1945, he bought $10,000 worth of bonds for which he paid $8,250 in cash and the balance by check and in 1948, he bought a house for about $28,000, paying $1,000 by check, $15,000 by mortgage and balance by cash, all the cash reputedly coming from the hoard. In September 1945, he bought $10,000 worth of stock of a finance company, using about $5,600 in currency toward payment, this cash, too, coming from the hoard allegedly. Because he was in politics, petitioner kept the money in a bank vault, avoiding normal bank deposits in his town because anyone could easily find out how much he had on deposit,—this from an attorney, who quite naively did not realize that out-of-town banks would have accommodated him as to deposits and privacy.

■■ This being a civil action, the determinations of the Commissioner have *prima facie* validity. Holland v. United States, 348 U.S. 121, 126, 75 S.Ct. 127, 99 L.Ed. 150. The petitioners have the burden of overcoming the presumption that the Commissioner's determinations were correct. Goldberg v. Commissioner, 5 Cir., 239 F.2d 316; Kashat v. Commissioner, 6 Cir., 229 F.2d 282; Halle v. Commissioner, 2 Cir., 175 F.2d 500.

■■ The petitioners' records were so inadequate and the subsidiary records were so devoid of exculpatory assistance that the Commissioner had little choice but to resort to the net worth method under § 41. This section was not intended to make a set of blinders which prevents the Government from looking beyond the self-serving declarations of a taxpayer's books. Holland v. United States, supra, 348 U.S. at page 132, 75 S.Ct. 127, 99 L.Ed. 150.

■■ Under the technique used, the establishment of an opening net worth with reasonable certainty was essential. Here the opening net worth was established at $28,067.12. Save for the items

of jewelry and furs and cash, this was stipulated to by the parties. The items have been previously adverted to. The petitioners' proof as to the furs and jewelry were so vague and indefinite as to the actuality and dates of the gifts, and so incredible as to the cash hoard, that we find nothing therein sufficient to disturb the opening figure. The leads given to the Government—Miller and the cash hoard—were investigated and the results of the investigation do not negate our conclusion. The fact that the Commissioner did not directly contradict petitioners' self-serving declarations would not compel the Tax Court to accept the declarations in the circumstances of this case, and it was eminently proper to use the net worth method here. Schwarzkopf v. Commissioner, 3 Cir., 246 F.2d 731, 734. The determinations of the Commissioner and of the Tax Court in this regard appear to be rational and fair rather than speculative and arbitrary and therefore will not be disturbed. Goe v. Commissioner, 3 Cir., 198 F.2d 851.

■ The total unreported income for the periods in question was $102,-277.74—disregarding the items just mentioned. (If these items were allowed, there would still be unreported income of $19,452.74.) The only disclosed sources of income were from the practice of law and salaried office holdings, both being taxable income and constituting likely sources from which the Commissioner and the Tax Court could reasonably find the net worth increases sprang. There was proof that over the period in question, the increases in net worth plus the expenditures exceeded the available declared resources. This justified the finding that there was unreported income attributable to earnings. United States v. Johnson, 319 U.S. 503, 517, 63 S.Ct. 1233, 87 L.Ed. 1546. There is no need to negative all the possible non-taxable sources of net worth increases. United States v. Massei, 355 U.S. 595, 78 S.Ct. 495, 2 L.Ed.2d 517.

Fraud is never presumed[5] but must be established by clear and convincing evidence. Valetti v. Commissioner, 3 Cir., 260 F.2d 185, 188; Commissioner v. Rubinstein, 3 Cir., 264 F.2d 478. But the consistent failure to report substantial amounts of income over a number of years, standing alone, is effective evidence of fraudulent intent. Schwarzkopf v. Commissioner, 3 Cir., 246 F.2d 731, 734. A consistent pattern of under-reporting large amounts of income may support an inference of willfulness. Holland v. United States, supra, 348 U.S. at page 139, 75 S.Ct. 127, 99 L.Ed. 150; Smith v. United States, 348 U.S. 147, 157, 75 S.Ct. 194, 99 L.Ed. 192. On the whole case, the highlights of which have been recited here, there was ample evidence that the taxpayer acted fraudulently with intent to evade taxes. Goe v. Commissioner, 3 Cir., 198 F.2d 851. In the Rubinstein case, supra, the Tax Court concluded that the Commissioner had not carried his burden of proving that a fraudulent return had been filed so as to avoid the statute of limitations, and this court's comment on that conclusion, adapted to the conclusion in the case at bar, is apt here: The case, therefore, involves simply the weighing of the evidence used to reach a conclusion. The conclusion that the evidence was strong enough to establish fraud is perhaps not the only possible conclusion that could have been drawn from what was before the court. But the conclusion is sustained by enough evidence so that we cannot say, which we must to reverse, that the finding was clearly erroneous.

[12] This fraud with intent to evade tax justified the imposition of penalties under § 293(b) of the Code. The statute of limitations is also avoided because the exception in § 276(a)[6] is brought into play by the same fraud.

The underestimation question was not specifically argued by petitioners. In any event, if the net worth computation is valid as to deficiencies and fraud penalties, it is valid as to underestimation.

In the Tax Court the case was heard by Judge Rice who heard all the testimony but died before he could write his opinion. The case was then assigned to Judge Van Fossan who made his findings and wrote his opinion from the record and the briefs filed with him. The parties were given notice they might request a rehearing or reargument but neither party made such request. It is now argued by counsel for petitioners that the trial judge had made certain side-bar comments in connection with the item of jewelry and furs that were favorable to the petitioners and that counsel thought this "transaction" was recorded in the judge's notes which would be used by the opinion writing judge but which, alas, were not so used. The explanation for not moving for a rehearing when the opportunity was offered is that "In light and in view of the fact that Counsel for the petitioners were under the impression that there was in existence the memoranda and notes of the departed Judge, they did not at that time request a new trial, feeling assured that Judge Rice's notes and memoranda would be adhered to concerning the credibility of the testimony of the petitioner and his wife." Of course, there is nothing to indicate what the judge's notes contained on this item or that he even made notes on it. Petitioners intentionally relinquished their right to move for a rehearing—a true waiver—on a gamble, the gamble that Judge Rice made favorable notes which Judge Van Fossan would follow. Having lost the gamble, they then moved for a rehearing and the motion was denied. In our opin-

---

5. § 1112 I.R.C. "* * * the burden of proof in respect of such issue shall be upon the Commissioner."

6. § 276(a) I.R.C. "In the case of a false or fraudulent return with intent to evade tax * * * the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time."

ion, the denial was obviously just; to hold otherwise would convert trials into games of chance. "There is no reversible error here because one judge of the Tax Court * * * heard the case and another judge * * * wrote the opinion." Halle v. Commissioner, 2 Cir., 175 F.2d 500, 504.

The decision of the Tax Court will be affirmed.

APPENDIX I

| | Year Ended 12-31-43 | Year Ended 12-31-44 | Year Ended 12-31-45 | Year Ended 12-31-46 | Year Ended 12-31-47 | Year Ended 12-31-48 | Year Ended 12-31-49 | Year Ended 12-31-50 |
|---|---|---|---|---|---|---|---|---|
| Net worth at end of year | $28,067.12 | $35,986.95 | $54,210.13 | $64,757.89 | $86,756.06 | $79,752.38 | $111,871.24 | $122,755.65 |
| Net worth at beginning of year | | 28,067.12 | 35,986.95 | 54,210.13 | 64,757.89 | 66,756.06 | 79,752.38 | 111,871.24 |
| Increase in Net Worth | | $ 7,919.83 | $18,223.18 | $10,547.76 | $ 1,998.17 | $12,996.32 | $32,118.86 | $ 10,884.41 |
| Add: personal expenditures less allowable deductions and nontaxable income | | 10,040.90 | 10,684.87 | 21,920.29 | 17,745.90 | 9,715.21 | 11,111.24 | 11,499.95 |
| Increase in net worth plus personal expenditures: reconstructed adjusted gross income | | $17,960.73 | $28,908.05 | $32,468.05 | $19,744.07 | $22,711.53 | $ 43,230.10 | $ 22,384.36 |
| Reported adjusted gross income | | 7,197.08 | 10,790.54 | 19,863.93 | 7,646.65 | 8,489.80 | 13,607.56 | 17,382.85 |
| Total unreported income | | $10,763.65 | $18,117.51 | $12,604.12 | $12,097.42 | $14,221.73 | $ 29,622.54 | $ 5,001.51 |
| | | | | 77.40* | | (151.02)* | (165.53)* | 88.41* |
| | | | | $12,681.52 | | $14,070.71 | $ 29,457.01 | $ 5,089.92 |

* Stipulated adjustments