ESTATE OF THOMAS P. McHENRY, Deceased, JEANNE GRACE McHENRY, EXECUTRIX, and ESTATE OF MARY E. McHENRY, Deceased, JEANNE GRACE McHENRY, EXECUTRIX, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of McHenry v. Commissioner
Docket No. 8134-72.
United States Tax Court
T.C. Memo 1974-306; 1974 Tax Ct. Memo LEXIS 13; 33 T.C.M. (CCH) 1409; T.C.M. (RIA) 740306; December 11, 1974, Filed. John J. Cahill, for the petitioners. Brian J. Seery and Lowell F. Raeder, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined deficiencies in the Federal income taxes of the deceased taxpayers, Thomas P. McHenry and Mary E. McHenry, for 1967, 1968, and 1970, and additions to tax under section 6653(b). [1] The deficiencies and additions to tax so *14 determined were as follows: Year
Deficiency
Addition to Tax (Sec. 6653(b), I.R.C. 1954)
1967
$ 4,085.17
$ 3,736.45
1968
4,557.47
2,278.74
1970
39,801.42
19,900.71
The primary issue before the Court is whether Thomas P. McHenry, now deceased, received income in the form of illegal kickback payments in the years at issue; if so, there are the further issues whether the income tax returns of Thomas P. and Mary E. McHenry for 1967 and 1968 were "false or fraudulent" within the meaning of section 6501(c), so that the bar of the statute of limitations is lifted, and whether any part of the deficiencies for each of the 3 years was "due to fraud," so that the determined additions to tax under section 6653(b) are applicable. FINDINGS OF FACT Jeanne Grace McHenry, executrix of the estates of Thomas P. McHenry (hereinafter sometimes referred to as McHenry) and Mary E. McHenry, both deceased, was a legal resident of Philadelphia, Pennsylvania, at the time the petition herein was filed. McHenry and his wife, *15 Mary E. McHenry, filed joint Federal income tax returns for 1967, 1968, and 1970. Mary E. McHenry died on April 10, 1970, and Thomas P. McHenry died on May 22, 1971. Letters Testamentary on the estate of Mary E. McHenry were granted to Jeanne Grace McHenry, daughter of the deceased, by the Register of Wills for the County of Philadelphia, Pennsylvania, on October 19, 1972. Letters Testamentary on the estate of Thomas P. McHenry were granted to Jeanne Grace McHenry by the Register of Wills for the County of Philadelphia, Pennsylvania, on June 2, 1971. As executrix of the estate of Thomas P. McHenry, Jeanne Grace McHenry gave notice to the district director of internal revenue in Philadelphia, Pennsylvania, that she was acting in a fiduciary capacity for the estate. McHenry, a Democrat, was a duly elected city commissioner of the city of Philadelphia from 1945 until his death in 1971. During the years at issue, there were two other city commissioners, Maurice Osser, a Democrat, and Louis Menna, a Republican. Osser was chairman. One responsibility of the city commissioners during the relevant period was the determination of the type and quantity of voting machines necessary *16 for elections held in the city. The commissioners forwarded their decisions to the city's Procurement Department which was responsible for the purchase of all materials and supplies. The city commissioners thus could assert that there was a need for voting machines and could specify the type and number of machines which would satisfy that need. Shoup Voting Machines Corporation (hereinafter referred to as Shoup) was in the business of selling voting machines to municipalities throughout the United States.It transacted business in 44 States. In 1965, Irving H. Meyers (hereinafter referred to as Meyers) became president of Shoup. Meyers had been told by his predecessor, Frank Stone, that in order to obtain contracts for the sale of voting machines to the city of Philadelphia, it would be necessary to make arrangements with the city commissioners for them to receive a portion of the contract price. Kickback arrangements were also necessary in several other municipalities. Meyers devised a scheme for generating the currency necessary for kickback payments and political contributions to the officials of several municipalities. He arranged to have various individuals in public *17 relations or law firms submit fictitious invoices to Shoup. Shoup would issue a check covering the invoices, and record the payment on its books as a business expense. The payees would report the full amount of the check as taxable income, pay whatever taxes were necessary, and return 50 percent of the check in currency to Meyers. Meyers stored the currency in his personal safe deposit box until it was needed for a payment to a city official. Among the people who submitted fictitious invoices were Marvin B. Guberman, an attorney in Miami, Florida, and Tom Foglia, an attorney in Los Angeles, California. Meyers would send out invoices as the need arose, usually after a contract award was received from a municipality. There was usually a sufficient time lapse between the award and payment for the machines to allow sufficient funds to be raised. The scope of the operation was large. At times during this period, Meyers had as much as $100,000 in the safe deposit box. The total amount paid out from 1966 to late 1970 was approximately $800,000, of which $150,000 was used for political contributions. Anthony Lemisch, a regional sales manager for Shoup, picked up some of the currency *18 from individuals who had submitted fictitious invoices and delivered it to Meyers in Philadelphia. He also delivered currency to various municipal officials outside of Philadelphia on several occasions during the period 1967 through 1970. Meyers made his first arrangement with a Philadelphia city commissioner at a luncheon with McHenry in the latter part of 1965. At this luncheon it was agreed that if McHenry would cause voting machine contracts to be awarded to Shoup, McHenry would receive a 5-percent "commission." Shoup paid its bona fide agents a 10-percent commission by check. However, since the fictitious invoice arrangement cost Shoup about one-half of the face amount of the invoice, Meyers offered only 5 percent to McHenry. In late 1965, the city commissioners worked out a 5-year lease-purchase arrangement with Shoup and another voting machine company whereby the city would trade in its machines and get new ones at a cost of $500,000 per year. The purchase orders for the machines were so structured that only these two companies could bid on the orders as they were issued, and the two companies could not bid against each other.The city commissioners allowed Shoup to *19 begin removal of old machines despite the lack of the approval of the city solicitor. Nearly one-seventh of the city's supply of voting machines, 592 in number, were removed by Shoup from the city's warehouse and destroyed. Most of the destroyed machines had been used about 60 times over a period of 30 years. At this point the then city comptroller learned of the destruction program and vigorously voiced his objections to Commissioner Osser, and the destruction program was stopped. However, several orders for new machines or for the refurbishing of the old machines, as described below, were later issued. In October 1966, Shoup was awarded a contract to sell 300 voting machines to the city of Philadelphia for the sum of $499,600.44. This amount was paid by check dated October 11, 1966. Within 10 days after receipt of the check, Meyers met with McHenry and paid him $25,000 in currency. After this initial payment, McHenry met with Meyers and informed him that thereafter payments would have to be split with Commissioner Osser. Meyers agreed because he felt that this was additional insurance in getting business for Shoup. In early 1967, Shoup again bid on the sale of voting *20 machines to the city of Philadelphia. On March 9, 1967, Shoup was awarded the order and entered into a contract with the city of Philadelphia for the sale of 300 voting machines. By check dated June 30, 1967, in the amount of $498,960, the city of Philadelphia paid Shoup for these machines. Within 10 days after the receipt of this check, Meyers made arrangements to meet separately with McHenry and Osser. Meyers met with McHenry at the Bellevue Court Restaurant and paid him $12,500 in currency. Meyers then met with Osser at the Bellevue Stratford Restaurant and paid him $12,500 in currency. Approximately 6 months later, on January 16, 1968, Shoup was awarded a bid on the sale of additional voting machines to the city of Philadelphia. Shoup then entered into a contract with the city of Philadelphia for the sale of 300 voting machines. By check dated February 29, 1968, in the amount of $498,960, the city of Philadelphia paid Shoup for the 300 voting machines.Within 10 days of the receipt of this check, Meyers made arrangements to meet separately with McHenry and Osser. Meyers met with McHenry at the Bellevue Court and paid him $12,500 in currency. Meyers then met with Osser at the *21 Bellevue Stratford and paid him $12,500 in currency. On November 13, 1969, Shoup was awarded a contract for the sale of 200 voting machines to the city of Philadelphia. By check dated May 15, 1970, in the amount of $367,554.55, the city of Philadelphia paid Shoup for these 200 voting machines. Shoup had developed an interlock mechanism, which permitted varied arrangements of candidates' names on the ballots, for installation on old voting machines. Interlocks were sold throughout the country by Shoup's bona fide sales agents who received a 30-percent commission on their sales. Meyers told McHenry and Osser, at separate meetings, that if they would influence the sale of interlocks to the city of Philadelphia, he could afford to pay each of them 7-1/2 percent of the total contract price. On February 25, 1970, Shoup entered into a contract with the city of Philadelphia to rebuild 1,500 voting machines with interlocks. By check dated May 19, 1970, in the amount of $809,594.37, the city of Philadelphia paid Shoup for the refurbishing of the 1,500 voting machines.
The two checks - the one to pay for the 200 voting machines and the other for the refurbishing of the 1,500 machines *22 - were received within a few days of each other. The approximate total of the two checks for $1.2 million. Upon receipt of these checks, Meyers owed McHenry and Osser $69,000 each - $9,000 each on the sale of 200 voting machines, and $60,000 each for the refurbishing of old machines with interlocks. At that time Meyers did not have enough currency available to pay each commissioner in full. Approximately 10 days after receipt of these checks, Meyers had McHenry and Osser come to his office at separate times. When each commissioner came to his office, he paid each one $30,000 in cash. At these meetings, Meyers told each commissioner that he would be able to pay each of them in full within a couple of months. McHenry and Osser agreed that Meyers could have additional time to raise the currency needed to pay them. Approximately 5 weeks after the $30,000 payment, Meyers arranged to meet with Osser at the cocktail lounge in Meyers' apartment house where Meyers paid Osser $15,000 in currency. The following day, Meyers met with McHenry at the Bellevue Court and paid him $15,000 in currency. Within 1 month thereafter, Meyers arranged to meet Osser in the cocktail lounge of Meyers' *23 apartment house. Meyers was in the lobby of his apartment house when he saw Osser drive by. Meyers stopped him, got in his car, paid him $24,000 in currency, and got out of the car. The following day, Meyers met with McHenry at the Bellevue Court and paid him $24,000 in currency. On August 26, 1970, Shoup was awarded a bid on the sale of additional voting machines to the city of Philadelphia. On August 28, 1970, Shoup entered into a contract to sell 150 voting machines to the city of Philadelphia. By check dated November 12, 1970, in the amount of $292,800, the city of Philadelphia paid Shoup for the 150 voting machines. within 10 days after the receipt of this check, Meyers met with McHenry at the Bellevue Court and paid him $7,500 in currency. Meyers met with Osser at the Bellevue Stratford and paid him $7,500 in currency. McHenry's salary from the city was $18,000.05 in 1967, $19,811.82 in 1968, and $19,923.30 in 1970. His monthly take-home pay during these years was approximately $1,100. From this paycheck it was McHenry's custom to give Mrs. McHenry $200 a week to run the household. Despite the responsibility of his wife for the household, McHenry would occasionally *24 pay certain bills as they became due. Mrs. McHenry managed to save some of this money which she, or her daughter, would deposit in a savings account with the Philadelphia Saving Fund Society. In addition to normal living expenses, Mr. and Mrs. McHenry spent $6,334.32 in 1968 through 1970 for medical and related expenses for Mrs. McHenry who was in a terminal cancer stage. During the years herein considered, Mrs. McHenry was not employed. Mr. and Mrs. McHenry lived in a rowhouse valued at $8,000 for estate tax purposes. McHenry also owned a house in Stone Harbor, New Jersey, valued at $54,000 at the time of his death. He purchased the house in 1959 for $24,000, making a downpayment of $12,000 and paying off the balance, which was secured by a mortgage, within 4 years. Mr. and Mrs. McHenry had several savings accounts and a checking account. The checking account with the Girard Trust Bank had a balance of $14,267.85 as of December 13, 1967. The balance grew during the years at issue to as much as $22,929 and never went below $10,000 during the same period. A savings account with the Philadelphia Federal Savings and Loan Association on January 5, 1967, had a balance of *25 $5,934.53. Due primarily to a deposit of $7,000 on November 18, 1970, the balance was $15,220.85 when the account was closed. In an account with the Philadelphia Saving Fund Society, Mr. and Mrs. McHenry had a balance of $38,759.65 as of February 1967. The balance rose as high as $56,963.24 in 1970 due to deposits and substantial interest payments. An account with the Sturdy Savings and Loan Association in Stone Harbor, New Jersey, had a balance of $7,767.65 as of 1970. McHenry also owned an interest in real property which was held for investment purposes. This property was sold on October 28, 1970, for the total sum of $54,500, of which $40,000 was a purchase money mortgage. The property was jointly owned in equal shares with George T. Fadgen, and the cash proceeds were split accordingly. McHenry's total gross estate was approximately $205,000, including miscellaneous assets and the cash and real property described above.
ULTIMATE FINDINGS OF FACT McHenry received income in the form of illegal kickback payments of $12,500 in 1967, $12,500 in 1968, and $76,500 in 1970. His failure to report this income was fraudulent with the intent to evade taxes. OPINION *26 Respondent determined that McHenry received unreported income in the form of kickback payments in the years 1967, 1968, and 1970. It is well settled that such illegal payments constitute taxable income. James v. United States, 366 U.S. 213 (1961); Rutkin v. United States, 343 U.S. 130 (1952). The burden of disproving the correctness of respondent's determinations of the deficiencies is on petitioners. Albert N. Shahadi, 29 T.C. 1157 (1958), affd. 266 F.2d 495 (C.A. 3, 1959), certiorari denied 361 U.S. 874 (1959); Manson L. Reichert, 19 T.C. 1027 (1953), affd. 214 F.2d 19 (C.A. 7, 1954), certiorari denied 348 U.S. 909 (1955). The burden of proving fraud by clear and convincing evidence rests with respondent. Sec. 7454. We think the evidence compels the conclusion that McHenry received kickback payments from Shoup during 1967, 1968, and 1970. Irving Meyers, who was president of Shoup during those years, testified unequivocally that he delivered to McHenry $12,500 in currency in 1967, $12,500 in 1968, and a total amount of $76,500 in 1970. Meyers testified that he delivered *27 equal amounts to Osser in those years. [2] The total amounts paid to McHenry and Osser represented approximately 5 percent of the payments made by the city of Philadelphia to Shoup under the voting machine sales contracts during the respective years. It is true that Meyers [3] has been convicted of income tax evasion and frankly admitted at the trial that he had made illegal kickback payments on behalf of Shoup to numerous other local government officials, as well as Osser and McHenry. *28 It is also true that he entered into an agreement with the Department of Justice to plead guilty to an income tax evasion charge, and that the agreement contemplates that his civil liability will not be finally determined until he has testified in other proceedings arising from the Shoup investigation. [4] However, some crucial points of his testimony were corroborated by other evidence. *29 According to a former city comptroller, at or about the time of Meyers' first contact with McHenry, in 1965, the specifications issued by the city of Philadelphia for voting machines were so structured that, as a practical matter, only Shoup and one other company could bid on voting machine orders, and those two companies could not bid against each other. At or about the same time, pursuant to the city commissioners' orders, some 592 of the city's voting machines (used only 60 times over a 30-year period) were hauled to a dump and destroyed. Shoup subsequently was awarded large contracts for voting machines and received payments for deliveries in 1966, 1967, 1968, and 1970. Meyers' testimony that he made currency payments to public officials, including Osser and McHenry, in order to obtain local government contracts, was corroborated, in part, by the testimony of Anthony Lemisch, regional sales manager of Shoup. Lemisch testified that he made at least four trips to the offices of Marvin B. Guberman, an attorney in Miami, and one or more trips to the offices of Tom Foglia, an attorney in Los Angeles, picked up packages of currency (more than $5,000 on each occasion), and delivered *30 them to Meyers. Lemisch also testified that on several occasions he received currency from Meyers and delivered it to certain county officials in cities outside of Philadelphia. At the time he made these currency deliveries, he knew that the purpose was "To affect the sale of the [Shoup] voting [machines]." While the foregoing tends to corroborate Meyers' testimony in certain respects, petitioners are correct that the case, in the final analysis, turns mainly on Meyers' credibility. Notwithstanding his culpability in bribing numerous public officials and his plea of guilty in income tax evasion, we think his testimony was basically truthful. It was not seriously shaken by skillful, searching cross-examination; nor was it directly controverted by other evidence.Nothing in Meyers' demeanor and conduct on the witness stand casts serious doubts on the truthfulness of his account of his dealings with McHenry. We recognize the difficult burden cast on petitioners of proving a negative - that McHenry did not receive kickback payments on the voting machines contracts - and we have taken that difficulty into account in weighing the evidence. We are also aware that the burden was *31 doubly heavy because of the unavailability of McHenry's testimony. The estate tax return filed on behalf of McHenry's estate and accepted by the Internal Revenue Service reflects a fairly modest accumulation of property (a gross estate of approximately $205,000) when compared with the amount of the kickback payments in issue. But the accumulation is substantial when compared with the small amount McHenry retained after dividing his paychecks with Mrs. McHenry. McHenry's three children, all adults, testified that the family lived frugally and that they knew nothing indicating that their father had received kickback payments or any other large amounts of cash. His bank accounts do not reflect any substantial unexplained deposits during the tax years, but he had cash on hand at his death in excess of $86,000. The record contains no fully satisfactory explanation of how McHenry was able to amass this much cash. There is the further question of fraud - whether McHenry's income tax returns for 1967 and 1968 were "false or fraudulent" within the meaning of section 6501(c), and whether any part of the deficiencies for 1967, 1968, and 1970 was "due to fraud" within the meaning of section *32 6653(b). McHenry was a Philadelphia city commissioner for many years. He was obviously an intelligent person who must have known that kickback payments were taxable income.His income tax returns for the years in controversy were prepared by his son, John J. McHenry, who testified that he had no knowledge of any large amounts of cash having been received by his father in those years. We think this concealment of the cash payments from the preparer of his returns and the consistent failure to report large amounts of income over a period of years is substantial evidence of fraud. Klassie v. United States, 289 F.2d 96, 101 (C.A. 8, 1961); Schwarzkopf v. Commissioner, 246 F.2d 731, 734 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court. It follows from these and other facts of record that the bar of the statute of limitations on assessments for 1967 and 1968 is lifted and the fraud penalties for all 3 years in controversy are sustained. Decision will be entered for the respondent. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted. ↩
2. Petitioners' counsel asked us to take judicial notice that, in the case of United States v. Maurice Osser, Criminal Division No. 72-349, a verdict of acquittal was rendered on all counts of conspiracy and extortion and that the same witnesses who testified in the present case testified at that trial. Respondent's counsel asked us to take judicial notice that Osser pleaded guilty to income tax evasion for failing to report as taxable income the payments to him by Shoup and Dunlap Printing. However, since the parties to that proceeding are not the same, collateral estoppel does not apply. We have based our Findings on the testimony and other evidence presented at the trial of the instant case. ↩
3. Petitioners objected to the admissibility of Meyers' testimony on the ground that it violated the so-called dead man's rule. Trials in this Court are conducted under the rules of evidence applicable to trials in the United States District Court for the District of Columbia, sec. 7453, and D.C. Code Ann. sec. 14-302 (1967) provides in relevant part: a judgment or decree may not be rendered in favor of the plaintiff founded on the uncorroborated testimony of the plaintiff or of the agent, servant, or employee of the plaintiff as to any transaction with, or action, declaration or admission of, the deceased or incapable person. Meyers was not the "agent, servant, or employee" of either party in this case, and his testimony was not "uncorroborated." See Logan Square Auto Mart v. Commissioner, 291 F.2d 136, 141↩ (C.A. 7, 1961), affirming a Memorandum Opinion of this Court. 4. A letter dated February 2, 1972, part of the agreement, from Henry E. Petersen, Assistant Attorney General, to William G. Hundley, contains the following: It is our understanding that Meyers' civil tax liability including fraud penalty, if any, will be determined apart from this agreement based upon the ordinary review and examination procedures of the Internal Revenue Service with of course, all of Meyers' rights to contest and litigate his tax liability reserved to him. It is understood, however, that the Internal Revenue Service has no intention of assessing to Meyers as taxable income any money which he received and passed on to others. It will not be necessary that such others acknowledge receipt, be actually charged and/or convicted of receiving such money in order to determine that Meyers did not keep it as income. It will be sufficient that Meyers testify under oath under circumstances which cause the government to be satisfied that the money was actually passed on to others that he did pass the money to others. It is understood that the government has serious question at this time as to the accuracy of Meyers [sic] income tax returns and to the extent that Meyers [sic] true income is established to be in excess of his reported income, he will be subject as stated above, to the ordinary review and assessment by the Internal Revenue Service with the possible imposition of fraud penalties left to determination by that agency or by the Court as stated above. ↩