MARVIN C. WHITE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
White v. Commissioner
Docket No. 11186-76.
United States Tax Court
T.C. Memo 1978-267; 1978 Tax Ct. Memo LEXIS 246; 37 T.C.M. (CCH) 1147; T.C.M. (RIA) 78267; July 20, 1978, Filed Marvin C. White, pro se. Vernon R. Balmes, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in petitioner's Federal income taxes and additions to tax: Addition to Tax Year
Deficiency
Sec. 6653(b) [1]
1965
$ 297.12
$ 735.05
1966
4,345.11
2,379.35
1967
2,390.25
1,272.44
1968
4,780.79
2,390.40
*247 On January 16, 1978, respondent filed an amendment to his answer to the petition claiming an increased deficiency of $ 147.53 for the year 1967 and an increased addition to tax of $ 73.76 for the same year. The issues for decision are: (1) Whether petitioner understated gasoline sales and taxable income from the operation of his service station during the years 1966 through 1968; (2) whether petitioner is entitled to a dependency exemption in 1965 for a person listed as "Alice"; (3) whether petitioner is entitled to claim his former wife, Ellen L. White, as a dependent for the years 1965 through 1968; (4) whether petitioner was entitled to file joint Federal income tax returns with his former wife for the years 1965 through 1968; (5) whether respondent properly adjusted petitioner's rent expenses and depreciation deductions for the years 1965 through 1968; and (6) whether any part of the underpayment of taxes for each of the years 1965 through 1968 was due to fraud with intent to evade tax by petitioner within the meaning of section 6653(b). FINDINGS *248 OF FACT Marvin C. White (petitioner) refused to stipulate any facts in this case. Consequently, all findings of fact herein are based upon the documentary evidence and testimony of witnesses, most of which was introduced by respondent. Petitioner resided at 20450 Redwood Road, Castro Valley, California, at the time he filed his petition in this case. He filed his Federal income tax returns with the Internal Revenue Service at San Francisco, California, for the years 1965 through 1968 as joint returns in the names of Marvin C. and Ellen L. White, and claimed an exemption for Ellen L. White as a taxpayer filing a joint return. Petitioner signed his name on these returns, but refused to state who signed the name of Ellen L. White appearing on these returns, on the basis of the Fifth Amendment to the Constitution of the United States. Petitioner and Ellen White have not lived together as husband and wife since October 18, 1950. Ellen White filed a complaint for divorce against petitioner in the Superior Court of the State of California for Lassen County. The complaint, summons, and order to show cause in such action were served upon petitioner on November 24, 1950. In December *249 1950, the parties entered into a property settlement, and an interlocutory decree of divorce was entered by the Superior Court. A final judgment of divorce was entered by the Superior Court for Lassen County as of December 20, 1951. The last time petitioner saw Ellen White or gave any financial support to her was in the year 1950. Petitioner was interviewed by Special Agents Venor and Stellmacher at his service station on February 25, 1970. Agent Venor told petitioner that he would like to speak with his wife in order to inform her of the nature of the investigation and have her identify her signature on the tax returns. Petitioner told Agent Venor that his wife would be able to talk to the agents at any time, and that they could either meet with her at the house on Montana Street, or she could come down to the agents' office. The agents were unable to locate Ellen White. Petitioner filed joint income returns with Ellen White and claimed her as a dependent for each of the years 1965 through 1968 so that he would have more money to spend. Petitioner obtained a California driver's license dated October 21, 1968, on which he specified that he was divorced. Petitioner *250 filed an individual Federal income tax return for the year 1969 in April 1970. The name of Ellen White had been blocked out on the first line of the tax return. Petitioner claimed "Alice" as a dependent on his 1965 return. He declined to state Alice's last name on the grounds that "it's possibly incriminating." Alice was the daughter of a friend of petitioner. Alice lived with her mother during 1965. Petitioner operated a service station business during the years 1965 through 1968. During 1966, 1967, and 1968 he kept the books and records of his service station, including his daily sheet and monthly records. Petitioner entered the gallons of Super Shell and Shell gasoline sold and the purported proceeds from these sales on lines 1 and 2 of the right-hand column of his daily records. He obtained the number of gallons of gasoline sold from the cumulative meter readings on his gasoline pumps at the end of each day. He subtracted the meter readings of gasoline at the end of the previous day and entered the difference as the gallons of gasoline sold for the current day on his daily sheets. Petitioner also kept monthly sales summaries and monthly earnings statements which *251 listed gallons of gasoline sold and sales proceeds for each day of the month, compiled from his daily sheets. If the purported daily sales proceeds are divided by the gallons of gasoline sold appearing on petitioner's daily and monthly records for the period from September 10, 1966 through December 31, 1968, the computed sales prices per gallon of Shell and Super Shell were 32.9 and 35.9 cents per gallon, respectively. Petitioner was one of the plaintiffs in an action filed in the United States District Court for the Northern District of California in the case of Russell L. Jones, et al. v. Shell Oil Company, Civil No. 47261. Petitioner claimed that Shell required him to sell gasoline at an unreasonably low price, thereby placing in issue the price at which he sold gasoline from September 10, 1966 through 1968. Petitioner furnished answers to Shell's interrogatories Set No. 1 in the Jones case compiled from his daily sheets. He read the answers and verified them under oath on January 8, 1968. Petitioner specified in his answers that on September 10, 1966, he raised his prices of Shell and Super Shell gasoline to 34.9 and 37.9 cents per gallon, respectively, and that *252 he maintained these prices through May 31, 1967. He also stated in the answers that he gave no discounts during this period. Petitioner stated in "Plaintiff's Further Updated Answers to Defendant's Interrogatories, Set No. 1" filed in the Jones case on October 13, 1969, that his selling prices for regular Shell and Super Shell were 34.9 and 37.9 cents per gallon, respectively, during the period from June 15, 1967 through March 4, 1969. Although petitioner knew that he was actually selling gasoline for at least 34.9 and 37.9 cents per gallon during this period, he recorded sales at the lower prices in order to offset purported "shortages at the pumps." Petitioner raised his prices in September 1966 and charged the higher prices through the remainder of 1966 and in 1967 and 1968 in order to obtain additional income. Petitioner gave discounts on gasoline sales to a few people during 1966, 1967, and 1968, and these discounts were reflected in petitioner's records in his cash shortage account. During the course of the Jones trial on November 1, 1969, petitioner obtained temporary possession of his books and records from the Court and added the following note to his *253 September 10, 1966, daily sheet: Bookkeeper, on 9-10-66, we took down the price sign and raised our price to 34.9 and 37.9. Do not post this price as such, figure it at 32 and 35 from now on, if I'm going to give the extra property away, and then whatever refunds go under pump cutting. I hope this will create an upper surge in margin of profit for we sure need it. No one else has the guts to start, so I will. Petitioner testified at the trial of the Jones case on November 3, 4, and 5, 1969, that the foregoing note had been prepared in 1966 or 1967 as part of his records. On November 12, 1969, petitioner admitted in his testimony in the Jones case that he had inserted the note on November 1, 1969. Judge Wollenberg held petitioner in contempt for having so perjured himself on the witness stand. Petitioner made admissions during the trial of the Jones case on November 12, 1969, as follows: (1) That his books and records for the years 1967 and 1968 were false as to the price at which he was selling gasoline; (2) that his books for the months of September through December 1966 were also false since they did not reflect the two cents per gallon more he was getting *254 for gasoline; and (3) that since his tax returns were prepared from his books, the income tax returns for such years were also erroneous. While petitioner asserted that he understated his gasoline sales in order to offset problems he was having with the computers and meters in his gasoline pumps, he knew that his cash shortage and overage account on his daily sheets could be used to account for discounts and lost revenues. Petitioner had access to all the daily cash from his service station. At the end of each day he would compute the amount of cash which should be in the cash drawer by multiplying the gallons of Shell and Super Shell sold by 32.9 and 35.9 cents per gallon, respectively, even though he had actually sold the gasoline for at least 34.9 and 37.9 cents, respectively. The computed amounts were then entered by petitioner in his daily sheets as the proceeds from the sale of gasoline. Ralph Davis prepared petitioner's income tax returns for each of the years 1966 through 1968 from information supplied to him by petitioner, who was fully aware that revenues equal to two cents per gallon were not reflected in the monthly profit and loss statements given to Mr. Davis *255 to prepare the returns. In 1964 and 1965, Mr. Davis prepared petitioner's daily records and summaries, read gas pump meters, collected the cash and made bank deposits. In 1966 Mr. Davis' services to petitioner were limited to the picking up and depositing of cash and the preparation of his 1966 return. In 1967 and 1968, Mr. Davis' services were limited to the preparation of petitioner's returns.
Mr. Davis never met Ellen White and did not see her sign petitioner's returns. He obtained from petitioner the name of "Alice" to be specified as a dependent child on the 1965 return. Mr. Davis did not prepare the daily sheet or monthly summaries of petitioner's service station operations for the years 1966, 1967, or 1968. He obtained from the petitioner the sales figures from the monthly summaries for these years. Petitioner did not state to Mr. Davis during the year 1966 that his gasoline pumps were incorrectly computing the amount of gasoline sales. The gross receipts set forth on Schedule C of petitioner's 1966 return of $ 208,533.25 were computed by Mr. Davis as follows: (1) He added the sales set forth in petitioner's monthly summaries and arrived at a total of $ 220,372.68; *256 (2) he determined that the collections on charge sales totaled $ 11,636.73 and deducted this amount in arriving at reported gross sales; and (3) he made further minor adjustments totaling $ 202.70. The 1966 sales reported on the return should have included collections on charge sales of $ 11,636.73. Sales set forth on the daily sheets maintained by petitioner for 1966 totaled $ 221,515.88, and collections on charge sales set forth on these sheets totaled $ 11,933.77. Mr. Davis erroneously deducted collections on charge sales computed by him to total $ 11,636.73 in arriving at gross sales of $ 208,533.25, reported on Schedule C of petitioner's 1966 income tax return. Mr. Davis obtained the gross sales figures shown on petitioner's returns for the years 1967 and 1968 by totaling the amounts appearing on the monthly summaries prepared by petitioner. Mr. Davis set forth the discounts on his work sheets and reflected them as deductions from gross sales on petitioner's returns for each of the years 1966, 1967, and 1968. Richard A. Schuler was the dealer representative for Shell Oil Company who was assigned responsibility for petitioner's service station during the period from *257 March 1966 through March 1968. Mr. Schuler called upon petitioner and surveyed his service station bi-weekly during the first half of this period, and once a week during the second half of this period. Mr. Schuler kept himself informed as to petitioner's detailed operations through an examination of petitioner's daily records and monthly sales records. Mr. Schuler observed that petitioner raised his prices in late September or early October 1967 to 34.9 and 37.9 cents for Shell and Super Shell, respectively. Petitioner's statements of profits and losses furnished to Mr. Schuler for each month during the period from October 1966 through March 1968 normally showed a net income of between $ 1,200 and $ 1,300 per month. When he called upon petitioner, Mr. Schuler did not observe petitioner giving discounts, free gasoline, or cash refunds to customers. Since Shell Oil owned petitioner's gas pumps, it was the company's responsibility to keep the tanks and valves in functioning order. Mr. Schuler observed that on one occasion the calibration of a pump was off so that it was pumping too little gasoline for the gallons it showed on the pump, and the glass in another pump was *258 broken. Shell Oil had its maintenance people recalibrate the pumps and order the replacement glass. On another occasion the maintenance people for Shell Oil replaced an underground valve at petitioner's service station so that gas could be pumped from an underground tank. Petitioner did not mention any other pump or tank problems to Mr. Schuler. Petitioner could change the gallons or dollar readings on his pumps if he chose to do so. Based upon his experiences as a dealer representative, his personal observations of Mr. White's business during the years 1966, 1967, and 1968, and upon the monthly reports shown to him by petitioner, Mr. Schuler thought petitioner's income should have been between $ 15,000 and $ 20,000 per year for each of these years. If service stations having petitioner's volume of business are divided into three income groups for these years, the lowest income dealer would probably make between $ 15,000 and $ 20,000 per year, while the dealers in the highest group would make between $ 30,000 and $ 40,000 per year. Any shortages of cash resulting from the pocketing of money by employees would show up in the cash shortage account on the daily books maintained *259 by petitioner for the years 1966, 1967, and 1968. Petroleum Engineering, Inc. had contracts with Shell Oil Company to perform the maintenance work on its service stations. Delmar B. Owen, the operations manager of Petroleum Engineering, had people under his supervision inspect the gasoline pumps at petitioner's station during the years 1967 and 1968. Petroleum Engineering checked the accuracy of the gasoline meters on petitioner's pumps during 1967 and 1968 and found very small variances between the recorded and the actual volume of gasoline being dispensed on some occasions. On the few occasions when the meters were found to be in error, they were adjusted to correctly reflect the dispensed volume of gasoline. These errors were usually in petitioner's favor since the pumps were dispensing less gasoline than the volume indicated. The computers in petitioner's gasoline pumps, which performed the function of multiplying the gallons sold times the price per gallon, were very accurate because there was direct mechanical gearing between the price per gallon and the gallons dispensed. During the last 6 months of 1969 the petitioner made frequent complaints about the malfunctioning *260 of his gasoline pumps. Petroleum Engineering employees kept fixing the pumps, but nothing stayed fixed. Mr. Owen and Petroleum Engineering were caught in the center between petitioner and Shell Oil. Petitioner could have set the price on a gasoline pump at 30 cents per gallon, dispensed ten gallons at that price for a total sale of $ 3, and then reset the price per gallon appearing on the pump to 35 cents per gallon. Adjusting the pump in this manner would give the erroneous impression that the computer in the pump had understated the amount of the sale by 50 cents. A computer on a gasoline pump will appear to have incorrectly multiplied the price per gallon times the volume of gas dispensed only if the price per gallon is changed in this manner. Petitioner's service station was within Alameda County and therefore was subject to the rules enforced by the Alameda County Department of Weights and Measures. Under these rules the actual volume of gasoline dispensed by a pump is compared to the volume recorded on the pump meter. For each five gallons (1155 cubic inches) of gasoline recorded on the pump meter, the actual volume of gasoline dispensed must be within the range of 1,148 *261 to 1,162 cubic inches of gasoline. If the pump is cheating the customer, it is marked out of service. If it is going against the station operator by dispensing too much gasoline, the county will put a courtesy repair notice on the pump. The county inspection reports for the years 1965 through 1968 reveal that there was nothing out of the ordinary as to petitioner's experiences with his gasoline pumps. When any of the pump meters were found to be out of tolerance, they were fixed within a short period of time and restored to service. During the period from September 11, 1966 through December 31, 1966, petitioner sold 151,093 gallons of gasoline. Petitioner intentionally understated the proceeds from these sales by two cents per gallon for a total understatement of $ 3,021.86 on the daily sheets and monthly summaries prepared by him. These records were furnished by petitioner to his accountant, Mr. Davis, for the preparation of his 1966 income tax return. The income set forth on petitioner's 1966 return was thereby understated by $ 3,021.86. Petitioner sold 518,613 gallons of gasoline during 1967 of which 45,062 gallons were sold in October 1967. Petitioner understated the *262 sales price of the 473,551 gallons sold during the months of January through September, November, and December 1967 by two cents per gallon for a total understatement of $ 9,471.02. Petitioner overstated gasoline sales during October 1967 by $ 466.36, resulting in a net understatement of gasoline sales for the year 1967 of $ 9,004.66. Petitioner sold Super Shell gasoline for 37.9 cents per gallon during January and February 1968 and for 38.9 cents per gallon for the remainder of 1968. He sold Shell gasoline for 34.9 cents per gallon during the months of January through March 1968 and for 35.9 cents per gallon for the remainder of 1968. Since petitioner recorded sales at 32.9 and 35.9 cents per gallon, respectively, he understated his gasoline sales by $ 15,952.68 during 1968. Petitioner's beginning and ending inventories and purchases of gasoline from Shell Oil show that he sold 518,613 gallons of gasoline in 1967 and 568,684 gallons in 1968. Petitioner recorded sales of gasoline in his books for 1967 and 1968 of 518,168 and 565,198 gallons, respectively. The unexplained differences of 445 gallons for 1967 and 3,486 gallons for 1968 are immaterial. Thus, petitioner was *263 selling or using approximately the same number of gallons he was receiving during these years. Rental expenses were erroneously computed in petitioner's returns for the years 1966, 1967, and 1968. Respondent correctly allowed additional expenses of $ 249.38 and $ 1,647.02 for the years 1966 and 1968, respectively, and correctly reduced rental expense for 1967 by $ 989.42. ULTIMATE FINDINGS OF FACT 1. Petitioner understated his taxable income for the years and in the amounts as follows: Amount of Year
Understatement
1966
$ 12,853.17
1967
8,394.08
1968
15,395.82
2. Petitioner fraudulently claimed his former wife Ellen White as a dependent on his Federal income tax returns for the years 1965 through 1968.
3. Petitioner fraudulently claimed "Alice," the daughter of a friend, as a dependent on his Federal income tax return for the year 1965. 4. Petitioner fraudulently, and with intent to evade tax, filed Federal income tax returns purporting to be joint returns made with his former wife, Ellen White, for the years 1965 through 1968. 5. Respondent correctly adjusted the rental expenses and depreciation claimed by petitioner. 6. Part *264 of the underpayment of income tax for each of the years 1965 through 1968 was due to the fraud of petitioner. OPINION Issue 1. Understatements of Income.
The evidence shows that petitioner consistently and intentionally understated gasoline sales in the amounts of $ 3,021.86 for 1966, $ 9,004.66 for 1967 and $ 15,952.68 for 1968, and that these amounts were not offset by unrecorded expenses or losses. Petitioner's evidence consisted of his own uncorroborated, self-serving statements that there were shortages coming from the pumps. In 1970 petitioner took some photographs of unidentified individuals standing next to gasoline pumps which apparently showed an incorrect computation of the amount of a gasoline sale. However, he did not attempt to introduce similar photographs relating to purported malfunctioning of gasoline pumps taken from 1966 through 1968. Moreover, petitioner could not explain how his gasoline pumps could have mechanically malfunctioned to the extent that they could consistently dispense too much gasoline to customers or understate the amounts of the gasoline sales. The record is devoid of testimony to support his contention that his unreported sales *265 were offset by his unreported costs and expenses relating to the malfunctioning of his gasoline pumps. Respondent's agent investigated each of petitioner's claims as to his unreported costs and expenses, and found them to be groundless. We agree. Respondent also called as witnesses three individuals who were in a position to know whether petitioner's gasoline pumps were malfunctioning. Their testimony completely refutes the petitioner's unlikely story. Accordingly, we uphold respondent's determination with respect to the unreported income received by petitioner from gasoline sales for the years 1966, 1967, and 1968. It is also clear that collections of $ 11,636.73 on charge sales were erroneously omitted by Mr. Davis, the return preparer, from sales listed on Schedule C of petitioner's 1966 return, and, consequently, the petitioner's income for 1966 should be further increased by this $ 11,636.73 item. Issue 2. Dependency Exemption for Alice.
Petitioner did not prove that he was related to the dependent named "Alice" claimed on his income tax return for 1965. Nor did he establish that he furnished over half of her support for that year. In short, none of the requirements *266 of section 152 are met. Therefore, the petitioner is not entitled to a dependency exemption for Alice for the year 1965. Issue 3. Dependency Exemption for Ellen White.
The evidence shows that petitioner was not married to Ellen White during the years 1965 through 1968. He also did not contribute anything to her support in those years. Thus, the requirements of section 152 are not met, and we hold that petitioner is not entitled to a dependency exemption for his former wife, Ellen White, for the years in issue. Issue 4. Joint Returns.
Petitioner introduced no evidence relating to his right to file joint income tax returns with Ellen White for the years 1965 through 1968. Respondent, on the other hand, has established that petitioner was not married to Ellen White at any time during these years and therefore was not entitled under section 6013(a) to file joint returns with her. The evidence shows that Ellen White and petitioner were finally divorced as of December 20, 1951. Petitioner has not seen her nor contributed to her support since 1950. He admitted that Ellen White did not sign the returns, but refused to divulge who did sign them. He also attempted *267 to mislead respondent's agents into believing that Ellen White was still living with him in 1970. Accordingly, we sustain respondent's determination on this issue. Issue 5. Rent Expense and Depreciation.
In his notice of deficiency respondent disallowed depreciation of $ 43.96 for 1966 and rent expense of $ 989.42 for 1967. Respondent allowed additional depreciation for 1965 of $ 108.36 and additional rental expenses of $ 249.38 for 1966 and $ 1,647.02 for 1968. Since the petitioner did not contest these adjustments at the trial, we sustain respondent's adjustments with respect to these items. Issue 6. Fraud
The final issue is whether any part of the underpayment of taxes for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b). Respondent bears the burden of establishing fraud, and he must prove it by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Levinson v. United States,496 F. 2d 651 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); Estate of Pittard v. Commissioner,69 T.C. 391 (1977); Estate of Temple v. Commissioner,67 T.C. 143 (1976); *268 Imburgia v. Commissioner,22 T.C. 1002 (1954); Petit v. Commissioner,10 T.C. 1253 (1948). To establish fraud respondent must show that the petitioner intended to evade taxes which he knew or believed he owned, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Powell v. Granquist,252 F. 2d 56, 60 (9th Cir. 1958); Acker v. Commissioner,26 T.C. 107, 112-113 (1956). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827(1964); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Since fraud can seldom be established by direct proof of intention, the taxpayer's entire course of conduct is often relied on to *269 establish circumstantially such fraudulent intent. Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,supra at 105-106. Based on the entire record in this case, the evidence clearly establishes that petitioner fraudulently underpaid his taxes during each of the years in issue. He arranged for the preparation of the tax returns, and those returns substantially understated his income from gasoline sales for each of the years 1966, 1967, and 1968. Such a consistent pattern of underreporting substantial amounts of income over a period of several years, standing alone, is persuasive evidence of fraud. Holland v. United States,348 U.S. 121, 139 (1954); Adler v. Commissioner,422 F. 2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Agnellino v. Commissioner,302 F. 2d 797, 801 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court; Shahadi v. Commissioner,266 F. 2d 495, 500-501 (3d Cir. 1959), *270 affg. 29 T.C. 1157 (1958); Schwarzkopf v. Commissioner,246 F. 2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1139 (1970). The evidence shows that petitioner raised his prices of Shell and Super Shell gasoline to 34.9 and 37.9 cents per gallon on September 10, 1966, and that he sold gasoline for not less than these prices during the remainder of 1966, 1967, and 1968. Yet petitioner admitted that throughout this period he recorded sales of Shell and Super Shell gasoline at 32.9 and 35.9 cents per gallon. At the end of each day he multiplied the actual gallons of Shell and Super Shell gasoline sold times the fictitious sales prices of 32.9 and 35.9 cents per gallon in arriving at the amount of sales he chose to record. These computed sales figures were recorded by petitioner in his daily and monthly records and were furnished to Mr. Davis who prepared his returns. Mr. Davis did not and could not verify the accuracy of these figures. There were no internal controls to prevent petitioner from understating his sales; and his rewards for doing so were immediate. Petitioner *271 had control over the amount of sales he recorded and over the cash box containing the sales proceeds. For each dollar of sales omitted at the end of each day the petitioner could remove one dollar from his cash box and place it in his pocket. Additional badges of fraud are laced throughout the evidence. Petitioner was keeping a double set of books during the period from October 1966 through March 1968. His monthly statements revealed to Mr. Schuler usually showed a net income between $ 1,200 and $ 1,300 per month. But his books and records and tax returns show net profits from his service station of only $ 3,249.27 for 1966, $ 1,856 for 1967, and $ 2,856 for 1968. Mr. Schuler testified that petitioner's income should have been in the range of $ 15,000 to $ 20,000 each year. The keeping of a double set of books and the making of false entries or alterations in the books are strong evidence of fraud. O'Connor v. United States,175 F. 2d 477 (9th Cir. 1949); Chesbro v. Commissioner,21 T.C. 123, 130-131 (1953), affd. per curiam 225 F. 2d 674 (2d Cir. 1955). Petitioner made false statements to the Internal Revenue Service agents *272 in an attempt to mislead them and to conceal his income. This is evidence of fraud. United States v. Newman,468 F. 2d 791, 794 (5th Cir. 1972), cert. denied 411 U.S. 905(1973). Petitioner falsely claimed on his tax returns for the years 1965 through 1968 that he was a married person filing jointly with his purported wife, Ellen White. He knew he was not married to Ellen White during such years, and that he had neither seen nor supported her since 1950. The filing of joint returns was false and fraudulent. McKeon v. Commissioner,39 B.T.A. 813 (1939). Petitioner fraudulently claimed "Alice," the daughter of a friend, as a dependent for the year 1965. Few facts are known about Alice. She lived with her mother during 1965. Petitioner was not married to Alice's mother. He did not wish to state where Alice's mother lived during 1965 and declined to state Alice's last name because it might be "incriminating." Under these circumstances it is clear that petitioner knew he was not entitled to claim Alice as a dependent for the year 1965. This is additional evidence of fraud and resulted in part of the underpayment of tax required *273 to be shown on petitioner's 1965 return. Wewend v. Commissioner,T.C. Memo. 1959-68. Accordingly, we hold on this record that the petitioner is liable for the additions to tax under section 6653(b) with respect to the deficiencies for the years 1965 through 1968. It follows that the statute of limitations presents no barrier to their assessment and collection. Decision will be entered for the respondent.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩