ESTATE OF ALLIE W. PITTARD, DECEASED, JOHN E. PITTARD, JR., EXECUTOR, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1399–74.     Filed December 6, 1977.

*Charles L. Steel IV*, for the petitioner.
*Gary F. Walker*, for the respondent.

IRWIN, *Judge:* Respondent determined a deficiency of $74,725.72 and an addition to tax for fraud under section 6653(b)[1] of $37,362.86 in petitioner's estate tax return filed in 1970. Other issues having been disposed of by agreement of the parties, the three issues remaining for decision are:

(1) Whether the executor improperly omitted his mother's corporation stock and her annuity payments from her original estate tax return;

(2) Whether the estate's deduction claimed for decedent's debt on three notes was canceled by decedent's right to look to Chapman Corp. for payment of the notes; and, if there exists such a right, whether this right of reimbursement was worthless; and

(3) Whether any part of the deficiency was due to fraud with intent to evade taxes.

### FINDINGS OF FACT

Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are found accordingly.

Allie W. Pittard (Allie) was a resident of Oxford, N.C., when

---

[1] All statutory references are to the provisions of the Internal Revenue Code of 1954, as amended and in effect during the taxable year in issue, unless otherwise indicated.

she died testate on July 19, 1969. John E. Pittard, Jr. (Pittard, Jr. or petitioner), decedent's son, was appointed executor of the estate. At the time of filing the petition herein, petitioner resided in Oxford, N.C.

A Federal estate tax return was filed on December 14, 1970, with the District Director of Internal Revenue, Greensboro, N.C. No payment of the amount reported due and owing on the return was submitted with the filing of the return. An amended Federal estate tax return was filed on August 29, 1972.

Allie's husband, John E. Pittard, Sr. (Pittard, Sr.), predeceased her in March 1953. Pittard, Sr., was survived by his wife, Allie, their daughter, Wilma P. Searles (Wilma or Mrs. Searles), and their son, John E. Pittard, Jr., who is the executor herein. Subsequent to his father's death, petitioner has resided in Oxford, N.C., and his sister, Wilma, has resided in California with her husband, Fred Searles.

When Pittard, Sr., died in 1953, he was president and chief executive of Chapman Lumber Co. of Oxford, North Carolina, Inc. (Chapman Corp.).

As of May 29, 1942, Chapman Corp. had 200 shares of issued and outstanding common stock. At his death Pittard, Sr., held 198 of these shares, his wife, Allie, held 1 share and Hal Pittard held 1 share.

Allie became executrix of Pittard, Sr.'s estate. With regard to the probate of that estate she reported his interest in the 198 shares of Chapman Corp. stock to the Clerk of Superior Court, Granville County. Allie was the sole devisee and legatee of Pittard, Sr.'s will, thus receiving all the rights and interests to those 198 shares held by her predeceased husband. When Allie died on July 19, 1969, her will conveyed her 200 shares[2] of Chapman Corp. stock to her daughter, Wilma, and to her son, Pittard, Jr., as follows:

> To my daughter, Wilma P. Searles, and my son, J. E. Pittard, Jr., share and share alike, I give, devise and bequeath in fee-simple forever my entire net real and personal estate, provided, however, that my son, J. E. Pittard, Jr., shall have and he is hereby extended the privilege of taking my Chapman Lumber Company stock on account of his share at a value to be placed upon the same as of the date of my death by agreement between my daughter and son, if

---

[2]Although the record does not explain how or when Allie acquired an interest in Hal Pittard's share of stock, the parties agree, for valuation purposes, that she had an interest in all outstanding 200 shares at her date of death.

possible, and if my daughter and son are unable to agree on the value of such stock I direct that such value be fixed and determined by three qualified appraisers, one to be selected by my daughter, the other to be selected by my son, and the third to be selected by the other two, and the value placed upon such stock shall be binding upon both my daughter and my son, and after the value of said stock shall have been determined in one or the other manners herein provided for my said son shall, if he desires, have such stock in full of his share in my estate if such value equals one-half of the net value of my estate, and if it does not equal one-half of the net value of my estate he shall have such stock on account of his share, and if it exceeds one-half in value of my net estate, then my said son shall effect equality with his sister by paying to her one-half of the difference between the value placed on said stock and one-half of the net value of my estate.

Pittard, Jr., had not read his mother's will until it was presented for probate. Pursuant to the provisions of this will, a proposed sales agreement was drafted by Wilma's attorney to enable Pittard, Jr., to purchase his sister's share of the Chapman Corp. stock. This proposed agreement followed a meeting held between Wilma and her husband, their attorney, an unnamed accountant, and Pittard, Jr., and his attorney, Stephen S. Royster. The written agreement was never signed and no stock was ever purchased subsequent to this agreement attempt.

After his mother's death, Pittard, Jr., was contacted by one of respondent's agents on an unrelated tax collection matter. The agent and petitioner had known each other for approximately 25 years. Pittard, Jr., showed the agent the assets of the estate and was reminded by the agent that one-half of Allie's estate would go to his sister. As executor, Pittard, Jr., filed his mother's estate tax within 17 months after her death. This return was prepared by an attorney based on information supplied by Pittard, Jr. Petitioner succeeded his mother as fiduciary of his father's estate. He filed a final accounting for his father's estate with Superior Court and personally negotiated the value of the Chapman Corp. stock for his father's estate. Petitioner did not include the 200 shares of Chapman Corp. as an asset of his mother's gross estate in the original return filed December 14, 1970.

Petitioner graduated from high school, attended college for 2 years, and then started working with his father, Pittard, Sr., at Chapman Corp. in 1948. Subsequent to his father's death in 1953, petitioner managed and operated the corporation. Allie was elected secretary of the corporation in 1953. On her death, the corporation's financial statements, books, and records were in

petitioner's control. At the time he served as executor of his mother's estate, he was also a member of the boards of directors for both the Union National Bank and the Granville Savings & Loan Association in Oxford, N.C.

As executor, Pittard, Jr., retained Stephen S. Royster, an attorney, for his mother's estate. When the will was probated, Royster discussed the estate with the clerk of the court. Royster prepared Allie's estate tax return from information provided him in the main by petitioner. He advised petitioner to account for every asset in the estate. While it is a general practice for Royster to sign the attorney's declaration stating that the return is true, correct, and complete based on all information relating to matters required to be reported on the return, Royster did not sign the declaration on Allie's estate tax return. Royster also represented Chapman Corp. and was familiar with its corporate affairs.

Allie's estate tax return was selected and assigned for audit 2 years after her death. Preliminary to auditing the return, respondent's agent contacted the clerk of the court for Granville County. The clerk disclosed public records to the agent which indicated that the Chapman Corp. stock was included in Pittard, Sr.'s estate and that Allie inherited that stock as sole beneficiary of that estate.

In November 1971, respondent's agent questioned Royster about the stock omission. The attorney replied that Pittard, Jr., had told him that he had purchased his mother's stock 4 to 6 years before her death. When petitioner was contacted by respondent's agent on May 4, 1972, he was advised by petitioner that he had purchased his mother's Chapman Corp. stock in 1953, the year his father died. Petitioner also told the agent that the documents concerning the sale had been burned in a fire that destroyed all Chapman Corp. records and some of his and his mother's personal records after his mother's death in 1969 and that the stock record book was destroyed by fire. Pittard, Jr., could not recall what he paid for the stock and produced no evidence of the purchase from any records. However, it was subsequently discovered that corporate records—including the corporate minute book, stock certificates, stock record book, some financial books and records, and some of Allie's personal correspondence between Allie and Chapman Corp.—were located in the corporation's safe at Allie's death in 1969 and were not

destroyed by fire. Respondent produced two stubs from the stock record book at trial. They contained the notation that on January 5, 1970, John E. Pittard, Jr., transferred to himself 198 shares of stock in Chapman Corp. from the estate of J. E. Pittard, Sr., and 1 share from Allie. During the administration of the estate, petitioner told his sister he had purchased Chapman stock from their mother. Pittard, Jr., also wrote out checks in his capacity as executor to himself or Chapman Corp. in the amount of $46,865.

On March 17, 1972, Pittard, Jr., wrote a letter to respondent's agent stating that the return as originally filed was a temporary return and that $43,000 in liabilities consisting of accounts and notes due should be deducted from the gross estate since they were not known about when the original return was filed. This was the first time that petitioner had mentioned that the return filed in 1970 was a temporary return. The tax effect of including these additional deductions would have meant a negative taxable estate and, thus, no tax would be due. When the agent contacted petitioner shortly thereafter, petitioner advised him that no tax was owed by the estate due to these deductions and that petitioner was employing Mr. Royster to prepare an amended return to that effect.

With regard to petitioner's allegations of stock purchase, respondent's agent recommended that the case be referred to a special agent for criminal investigation. Both the agent and the special agent met with Mr. Royster in his office on August 28, 1972, along with petitioner's sister, Wilma, her husband, and their attorney. At the conclusion of the conference, it was agreed by the attorneys that Pittard, Jr., would be requested to file an amended return. Later that day the two agents met briefly with petitioner. The special agent informed him of his constitutional rights.

Mr. Royster prepared an amended return based on information furnished him by petitioner, disclosing Allie's omitted interest in the Chapman Corp.; however, that interest was valued at zero for July 19, 1970, the alternate valuation date. Petitioner signed it and respondent's agent received it the next day, August 29, 1972. Prior to this amended return, however, petitioner submitted a financial statement to the Central Carolina Bank & Trust Co. in Oxford, N.C., dated December 31, 1969, in which petitioner stated the book value of the Chapman

Corp. to be $276,820.14. In 1967, Pittard, Jr., represented to Planter's National Bank & Trust Co. in another collateral matter, that his mother owned stock in Chapman Corp. by indicating that she had received dividends of $6,000 the previous year. This same submission indicates that Wilma and petitioner received dividends of $6,000 each. In 1970 the Chapman corporate income tax return reflects a book value of $170,097.78.

The Internal Revenue Service's policy guiding special agents in North Carolina called for a timely and prompt investigation. Otherwise a criminal referral file was to be closed. Prior to the commencement of a field investigation respondent's special agent closed his criminal investigation file for Pittard, Jr., due to the heavy work load and the lack of manpower available at that time in the Intelligence Division. He did this even though it was his opinion this case justified investigation. The special agent gave no consideration to civil liabilities.

During the course of the audit, petitioner produced no financial information or evidence with regard to the value of the corporation or its stock. After the audit examination petitioner submitted to the Internal Revenue Service some information which included a July 1970 balance sheet prepared for petitioner by Mr. Stark, a C.P.A., which was represented to be a statement of Chapman Corp.'s assets and liabilities. This balance sheet showed assets of $135,175, liabilities of $116,985.98, and stockholder's equity of $18,189.02. The balance sheet omitted the corporate land, building, and mill.

By using the $18,189.02 stockholder's equity figure and by adding figures for the costs of the land, building and mill, the parties agreed on a figure of $31,574 for the value of the outstanding stock.[3]

---

[3]The stipulation in pertinent part states:

"The parties stipulate that there have been at all times only 200 shares, rather than 400 shares, of issued and outstanding stock of Chapman Corporation; and that the total fair market value of the 200 shares of Chapman stock on the alternate valuation date for Federal estate tax purposes was $31,574.00. For the purpose of reaching an agreement upon this valuation issue, the parties made the following tabulation:

| | |
|---|---:|
| Net worth from exhibit | $18,189 |
| Cost of land | 7,950 |
| Cost of building | 29,486 |
| Cost of mill | 7,523 |
| Total | 63,148 |

The parties then agreed to value the outstanding Chapman Corporation stock at 50% of that figure, or $31,574.00, for reasons unexplained here."

Another issue is the alleged omission of annuity payments. When Allie died, she was receiving monthly annuity payments from Protective Life Insurance Co. of Birmingham, Ala. The monthly payments were generated by insurance proceeds from a policy regarding John E. Pittard, Sr. Pursuant to Allie's request on May 12, 1953, the insurance proceeds became payable in monthly installments over a 20-year period, but were to be converted into equal lump-sum payments to her daughter, Wilma P. Searles, and to her son, John E. Pittard, Jr., in the event of her death. Notwithstanding her request for a lump-sum payment in the event of death, the monthly checks continued after her date of death, until termination of the installments in 1973. During the period from Allie's death in 1969, until termination in 1973, the monthly checks in the amount of $49.91 were issued payable to Allie W. Pittard, and were endorsed by John E. Pittard, Jr., as executor.

Schedule I of the original estate tax return states that Allie was not receiving an annuity immediately before her death. The amended return includes Allie's annuity as an asset in her gross estate.

A third matter involves a deduction for $38,500 for three notes. Petitioner instructed his attorney, preparatory to filing the amended return, to claim a deduction of $38,500[4] for notes payable to three banks from Allie's gross estate. No deduction was claimed on the original return. A deduction was claimed on Schedule K of the amended return.

When respondent's agent asked Pittard, Jr., for substantiation of these notes, he was unable to produce any. He reiterated that all the records were destroyed in a fire at Chapman Corp.

The notes in question refer to three transactions. On February 28, 1969, Allie signed a note to Union National Bank for $10,000. On July 5, 1969, Allie cosigned a note with Pittard, Jr., to Planters National Bank & Trust for $8,500. Just prior to her death in July 1969, she signed a third note to Central Carolina Bank & Trust Co. for $20,000.[5] The funds generated by the three notes were transferred by Allie to Chapman Corp.'s cash account

[4]Schedule K of the original return lists a general category of "notes payable to Chapman Lumber Company" at a value of $32,500. These notes were not included on the amended return. The parties, in regard to the issue of whether the notes were payable by decedent to Chapman Corp., have stipulated that the deduction for the claimed obligations is not allowable.

[5]The record does not indicate whether she was solely, jointly, or secondarily liable on the third note.

and were utilized by the corporation for its benefit. The $20,000 was secured by stock which she had pledged to the bank. This stock was an asset in her estate and it was used to pay the note.

## ULTIMATE FINDINGS OF FACT

(1) Chapman Corp. was financially able to repay Allie for the money she borrowed from the banks and transferred to the corporation for its benefit.

(2) In 1970 executor John E. Pittard, Jr., understated the amount of Federal estate tax required to be shown on his mother's estate tax return, and this was due to fraud.

## OPINION

Petitioner claimed a deduction of $38,500 on the amended return of his mother's estate for indebtedness he and his mother had incurred in borrowing certain funds. The parties have stipulated that proceeds of these loans were transferred to the corporation and utilized in its business.

Respondent maintains that any deduction claimed by the estate[6] for decedent's indebtedness is canceled or set off by decedent's right to look to Chapman Corp. for payment of the notes, and that petitioner has not demonstrated that this right of reimbursement was worthless.

Petitioner, on the other hand, points to the notes that are signed by Allie as evidence that a personal debt was incurred. He maintains he had no notice of facts tending to disprove the claimed indebtedness, and directs us to the fact that assets from Allie's estate were used to satisfy one note. He contends that the right to reimbursement from the corporation was worthless because the corporation was incapable of repaying the amount of transferred proceeds.

We do not doubt the validity of the indebtedness which Allie incurred in borrowing the funds. As such, the amount of the indebtedness is properly deductible in arriving at a value for the taxable estate. However, we think it is clear that the transfer of the funds from Allie to the corporation created an asset properly

---

[6]Under sec. 2053, a deduction is permitted for claims against the estate, sec. 2053(a)(3), and for indebtedness in respect of property "where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate * * * ." Sec. 2053(a)(4).

includable in Allie's estate, that asset being the right of reimbursement from the corporation.

Having decided that the right to reimbursement was an asset properly includable in the decedent's estate, we must now consider petitioner's major contention—that the asset had no value.

The appropriate date of valuation is the alternate valuation date, July 19, 1970, 1 year after decedent's death. Petitioner asserts the stipulated value of the stock on the alternate valuation date of $31,574 precludes a finding that the corporation could have paid the notes. He also points to the testimony of William Stark, C.P.A., to the effect that the company was incapable of paying the notes.

We have several problems with petitioner's assertions. First of all, the $31,574 book value figure does not of itself preclude the corporation's ability to pay the notes since a net worth in the corporation below the amount of the loans from Allie is not the only factor to be considered. Although we are given Stark's conclusion that the corporation did not have the liquidity to pay the loans, we cannot rely solely on his judgment because he formulated that determination on the basis of information he accepted which was prepared by another accountant. Neither Stark nor petitioner could identify the components of certain tabulations. In any event inability to pay is not synonymous with worthlessness.

The income tax returns filed by Chapman Corp. and signed by petitioner show a book value for the corporation in the amount of $168,751.83 for the year ended December 31, 1969, and in the amount of $170,097.78 for the year ended December 31, 1970. While these figures do not provide the best indication of value, we feel they are indicative of an ability to pay an obligation in the amount of $38,500 during the year 1970.

Due to the state of the record, we feel our only recourse is to hold that petitioner failed to meet his burden of proof and that the value of the obligation was the full amount of the transferred funds, $38,500. Cf. sec. 20.2031-4, Estate Tax Regs.

The next issue for decision is whether petitioner John E. Pittard, Jr., as executor for his mother's estate, understated the assets of the estate with intent to evade tax, rendering him liable for an addition to tax for fraud pursuant to section 6653(b).

On this issue, the burden of proof is on respondent and must be met by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; *Estate of Temple v. Commissioner,* 67 T.C. 143 (1976); *Fox v. Commissioner,* 61 T.C. 704 (1974); *Otsuki v. Commissioner,* 53 T.C. 96, 105–106 (1969). If this burden is met, the 50-percent addition to tax is properly applied to the deficiency. Sec. 6653(b).[7]

The determination of fraud is primarily a question of fact to be resolved from an analysis of the entire record. *Stratton v. Commissioner,* 54 T.C. 255 (1970). "The fraud meant is actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing." *Mitchell v. Commissioner,* 118 F.2d 308, 310 (5th Cir. 1941).

Two hundred shares of Chapman Corp. stock were initially omitted from Allie H. Pittard's estate tax return filed by petitioner in 1970. The stock was later included in the gross estate at a zero value in an amended return filed by petitioner in 1972.

It is petitioner's contention that he believed he owned Chapman Corp. at the time of his mother's death and that there is no evidence that he had actual notice or knowledge to the contrary. Respondent asserts that (1) petitioner had no grounds to believe he honestly had purchased his mother's interest in the corporation; (2) petitioner intended to persuade respondent's agent to terminate his audit without disclosing the omitted stock; (3) petitioner did not concede the existence of stock in his mother's estate until he was contacted by a special agent who read him his constitutional rights preliminary to a criminal investigation; and (4) petitioner's reporting of the 200 shares[8] at zero value on the amended return was not disclosure, but rather further concealment of the value of the unreported stock.

An examination of all the evidence in the record reveals sufficient inconsistencies in petitioner's position to refute his

---

[7]SEC. 6653. FAILURE TO PAY TAX.

(b) FRAUD.—If any part of any underpayment (as defined in subsection (c)) of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. In the case of income taxes and gift taxes, this amount shall be in lieu of any amount determined under subsection (a). * * *.

[8]Although 400 shares are shown on the returns, the parties have stipulated that only 200 shares were outstanding.

contentions and to present convincing evidence of an intent to evade tax.

When Pittard, Sr., died in 1953, his wife Allie was the sole beneficiary of his will and became the owner of his shares of Chapman Corp. stock. Petitioner succeeded his mother as fiduciary of his father's estate. He filed a final accounting for his father's estate on July 21, 1969, acknowledging his mother as the sole devisee and legatee of Pittard, Sr.'s estate. He personally negotiated the value of the Chapman Corp. stock for his father's estate. Petitioner knew his mother had inherited his father's interest in Chapman Corp. at least 17 months before he filed her estate tax return.

When Allie died in 1969, her will reflected her ownership in the stock and its bequest of equal shares to her son (petitioner) and to her daughter, with an option for petitioner to buy all of the stock under specified condition. There is no evidence in this case that the stock was transferred or purchased by anyone from Pittard, Sr.'s death in 1953 to Allie's death in 1969.

Despite this, however, Pittard, Jr., informed his sister during the administration of the estate that he had purchased the stock in issue from their mother. To avoid inclusion of the stock in Allie's estate, he reiterated this claim of purchase to the attorney who prepared Allie's estate tax return in 1970, and again to respondent's agent in 1972. The agent was told by Pittard, Jr., that his purchase of this stock had occurred in 1953, the year his father died. When he was asked for tangible documentation of the sale, Pittard, Jr., told the agent that all documents concerning the purchase of the stock had been destroyed in a fire occurring at the corporation subsequent to his mother's death. In truth, the corporate stock record book, the corporate records, and some of Allie's personal correspondence with the corporation were found in the corporation's safe after Allie's death in 1969, and were introduced at trial. The stock record book reflects that Pittard, Jr., transferred 199 shares of Chapman Corp. stock to himself on January 5, 1970, an incongruity which not only bodes ill with petitioner's prior assertions, but also negates petitioner's assertion that these same records were destroyed by fire after Allie's death in 1969. Nevertheless, the entire record is devoid of any substantiation to deem this transfer a purchase rather than a misappropriation. We also note that Pittard, Jr., referred to the same stock record

book, which he falsely claimed had been burned, to review the Carolina Power & Light stock for inclusion in Allie's gross estate. This is added evidence of petitioner's efforts at concealment.

Also, when one of respondent's agents, who had known Pittard, Jr., for 25 years and had many business contacts with him prior to this case, contacted Pittard, Jr., on another tax matter after Allie died, the agent reminded petitioner that one-half of his mother's estate would go to his sister, Wilma. Pittard, Jr., replied that if he had his way, he would retain all of the estate.

Further, the attorney who prepared the original return for the estate had also represented the Chapman Corp. and was familiar with its affairs, yet he did not follow his customary practice of signing the attorney's declaration on the estate tax return.

We do not believe that, had petitioner purchased the stock as he alleged, he would have forgotten the details of the purchases and would have had no documentation. As the operating head of one corporation and a board member of two others, he was bound to be knowledgeable of such matters.

We also find it noteworthy that only after petitioner found himself on the threshold of a criminal investigation by the special agent reading him his constitutional rights did he agree the stock should be included in the estate in an amended return. Several events preceded and generated the filing of this second return which return still left room for doubt.

There was the investigation by the agent of the assertion by Pittard, Jr., that he purchased the stock in 1953 and later that he purchased it 4 to 6 years before his mother's death.

There was the meeting shortly after Allie's death in 1969 between petitioner, Stephen S. Royster, his attorney, and his sister, her husband, and their attorney to draft a sales agreement for petitioner to purchase his sister's share of his mother's stock as provided for in his mother's will.

There was the letter, in March 1972, which petitioner wrote to respondent's agent declaring that the original return was temporary and that there was $43,000 in additional liabilities which had not been set forth on Schedule K. Without inclusion of Allie's stock interest, the effect of the additional deductions would have canceled all tax due and owing on the estate tax return. This position was again urged by petitioner to the

revenue officer who attempted to collect the tax owing on the original return in 1972. As it turned out the Schedule K deductions on the original return consist of a hospital bill of $21, utilities in the amount of $29, and notes payable to Chapman Corp. of $32,500. Those on the amended return total $40,212.50, consisting of the $21 hospital bill, the $29 utility bill, three notes payable to banks in a total amount of $38,500, and a miscellaneous list totaling $1,662.56. The difference was $7,662.50 and not $43,000 as petitioner had indicated.

Further, when petitioner included the value of his mother's stock in the amended return, he included it at a zero basis and did not acknowledge that the corporation was worth more than that until the agent pointed out to him that the Chapman Corp. corporate tax return for 1970 showed a net worth of $170,097.78. Moreover, the financial statement Pittard, Jr., prepared in 1969 of Chapman Corp. and presented to the Central Carolina Bank & Trust Co. showed a book value of $276,820.14.

There was a meeting held on August 28, 1972, between the revenue agent, the special agent, Pittard, Jr.'s attorney, and Mr. and Mrs. Searles and their attorney. The agents discussed the omitted stock and advised that Pittard, Jr., should file an amended return. Later the 2 agents met with petitioner and informed him of his constitutional rights. The next day an amended return which included the stock at zero basis was handed to the agents.

We find a similar pattern regarding the omission of Allie's annuity payments from the original estate tax return. When Pittard, Jr.'s attorney prepared the return, he relied on the information provided by Pittard, Jr. As Pittard, Jr., instructed, the attorney indicated on Schedule I that Allie was not receiving an annuity prior to her death. Petitioner testified that he knew his mother was receiving monthly annuity payments when the original return was filed, he knew the approximate expiration date for the annuity, and he knew the approximate value of the annuity at her death. Petitioner claims he was merely negligent in his exclusion of the annuity from the original return and he voluntarily disclosed the annuity on the amended return. We cannot help but note the circumstances under which he signed the second return and point to 16 monthly annuity checks which were endorsed by Pittard, Jr., as executor in the 17-month interim between his mother's death and the time her original

estate tax return was filed. These circumstances refute his claim of mere negligence.

Inherent in the resolution of this issue are the actions of Pittard, Jr. He assumes several roles in this case—general manager of the corporation, executor of the estate, and cobeneficiary of the estate—and his actions in these various positions are not delineated according to the differing responsibilities he bears for each. Pittard, Jr.'s position is impaired by more than just a lack of documentation. The entire record reveals disconcerting inconsistencies on his part, unfounded beliefs contrary to fact, and a serious lack of regard for principled business practices.

He commingled the estate's funds with the corporation's and his own holdings in a manner which accrued to his advantage on any particular occasion. In his corporate stance he benefited from his mother's loans without providing her with a promissory note for the proceeds of the loans transferred by her to the corporation. His corporate position also enabled him to execute a transfer of stock to himself after the stock had been devised to both himself and his sister. As an executor desiring that the estate pay as little tax as possible, and protecting his interest as a cobeneficiary, he needed a vehicle to show his mother's personal loans to the corporation were not going to be repaid, so, switching to his corporate role, Pittard, Jr., attempted to indicate a corporation in dire financial straits, unable to pay back the loans. Then reverting to his position as an executor, Pittard, Jr., accepted the corporation's claim that it was unable to repay the debt and declared it worthless. An objective executor has a responsibility to pursue such claims.

In conclusion, we have given careful scrutiny to the entire record in this case and are convinced that the corporation was financially able to reimburse the estate for money borrowed by Allie and transferred to the corporation for its benefit. In addition, we find that the omissions of the stock and the annuity payments were due to fraud with intent to evade tax.

*Decision will be entered under Rule 155.*