DWAIN LIVELY AND MARIE LIVELY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lively v. Commissioner
Docket No. 29701-89
United States Tax Court
T.C. Memo 1992-23; 1992 Tax Ct. Memo LEXIS 36; 63 T.C.M. (CCH) 1782; T.C.M. (RIA) 92023; January 13, 1992, Filed *36 Decision will be entered under Rule 155. Michael J. Abramovitz, for petitioners. James Gehres, for respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income tax for the calendar years 1985 and 1986 in the amounts of $ 216,852 and $ 14,909, respectively, additions to tax for fraud under section 6653(b)(1) [1] and (b)(1)(A) in the amounts of $ 108,426 and $ 8,534, respectively, and additions to tax for substantial understatement under section 6661 in the respective amounts of $ 36,721 and $ 1,553. Respondent also determined additions to tax under section 6653(b)(2) for 1985 and under section 6653(b)(1)(B) for 1986 in an amount equal to 50 percent of the interest due with respect to the portion of the underpayment of tax attributable to fraud. *37 In his answer respondent alleged as an alternative to the addition to tax for fraud that petitioners were liable for the additions to tax for negligence for the years 1985 and 1986 under section 6653(a)(1) and (2) and section 6653(a)(1)(A) and (B), respectively. In the answer respondent also alleged that petitioners were liable for the addition to tax under section 6651(a)(1) for late filing of their 1986 return, but on brief conceded that petitioners had demonstrated reasonable cause for the late filing of that return. The parties have disposed of all issues involving the computation of petitioners' tax liability in this case and also have stipulated that the portion of the underpayment in each of the years attributable to the agreed disallowance of a claimed bad debt deduction in the amount of $ 190,000 for 1985 and $ 45,000 for 1986 is not to be considered part of the underpayment of tax due to fraud. The only issues left for our decision are: (1) Whether any part of the underpayment of tax for the years here in issue was due to fraud with intent to evade tax on the part of petitioners or either of them, and if so, what portion of the underpayment of tax in each of the years *38 is due to fraud; (2) in the alternative, whether a portion of the underpayment of tax is due to negligence, and if so, the amount of the underpayment due to negligence; and (3) whether petitioners are liable for the addition to tax for substantial understatement of income tax for the year 1985. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, whose legal residence at the time of the filing of the petition in this case was in the State of Colorado near the town of Dolores, filed joint Federal income tax returns for each of the years 1985 and 1986. The 1985 return was filed on or before April 15, 1986, and the 1986 return was filed on May 12, 1987. During the years 1985 and 1986 petitioner Dwain Lively was engaged in the logging business in the vicinity of Dolores, Colorado. Petitioner Marie Lively also worked in the business performing administrative, office management, and bookkeeping functions. During the taxable year 1985 petitioners received total gross income from the logging business of $ 1,092,309.02 and during 1986 received gross income of $ 461,667.18 from the logging business. During the years 1985 and *39 1986 Navaho Forest Products, Inc. (Navaho) was a major source of petitioners' logging income. Mr. Lively had contracted with Navaho to cut timber on the tribal lands of the Navaho Indians and haul it to the Navaho mill. Sometime in the late 1970s, petitioners attended a seminar in the area of Colorado near where they lived, which was sponsored by an organization that petitioners referred to as the Anderson Group. Later petitioners participated in seminars conducted by persons who were known as the Nassau Group (Nassau). After attending these seminars, petitioners began opening bank accounts in various names, which they referred to generally as foreign trusts. They transferred properties to certain of these various so-called foreign trusts and also deposited money in bank accounts under the name of the so-called foreign trusts. During the years 1985 and 1986 the contracts between Navaho and Mr. Lively were made in the name of Timber Associates, one of the so-called foreign trusts, and Aspen Unlimited, another of the so-called foreign trusts. During 1985 and 1986 petitioners maintained checking account #113395 in the Valley National Bank of Cortez, Colorado, in the name of Aspen *40 Unlimited and maintained checking account #106739 in the Valley National Bank of Cortez, Colorado, in the name of Timber Associates. Petitioners had complete control of and sole authority to draw checks on these accounts. During the year 1985 petitioners deposited $ 366,065.74 of receipts received from Mr. Lively's logging work for Navaho in the Aspen Unlimited account at the Valley National Bank of Cortez, Colorado, and deposited $ 719,993.28 of the amounts Mr. Lively was paid for cutting timber for Navaho in the account under the name of Timber Associates in the Valley National Bank of Cortez, Colorado. In 1986 petitioners deposited $ 78,245.50 of amounts paid to Mr. Lively for cutting timber in the account at Valley National Bank of Cortez, Colorado, under the name of Aspen Unlimited and deposited $ 542,917.18 of amounts paid to Mr. Lively for cutting timber for Navaho in 1986 in the account at Valley National Bank of Cortez, Colorado, in the name of Timber Associates. In addition to the accounts maintained by petitioners in the name of Aspen Unlimited and Timber Associates at the Valley National Bank of Cortez, Colorado, petitioners also maintained a joint checking account *41 #332674 in their individual names at that bank and made deposits into that account in the amounts of $ 191,024.43 and $ 86,340, respectively, during the years 1985 and 1986. During 1985 and 1986 petitioners also maintained joint checking account #302597 in the Valley National Bank of Cortez, Colorado, in their individual names and made deposits in such account in the total amounts of $ 325,000 and $ 176,468, respectively, for these years. This account was used to a large extent for payroll payments in Mr. Lively's timber cutting business. During the years 1985 and 1986 petitioners maintained checking account #112313 in the Mancos Valley Bank of Mancos, Colorado, in the name of Spruce Enterprises and made deposits in this account in the total amounts of $ 18,912.50 and $ 10,201, respectively, during those years. Petitioners also during 1985 and 1986 maintained checking account #202894 in the Mancos Valley Bank of Mancos, Colorado, in the name of Alpine Ventures and made deposits in this account in the total amounts of $ 65,000 and $ 105,123.84, respectively, during these years. During the year 1986 petitioners maintained checking account #200654 in the Mancos Valley Bank of Mancos, *42 Colorado, in the name of Dwain Lively Logging Company and made deposits in this account in the total amount of $ 2,500 during that year. Petitioners received gross income from the logging business during the year 1985 in the amount of $ 1,092,309.02, which was composed of $ 696,243.28 deposited in the Valley National Bank in the account under the name of Timber Associates, $ 366,065.74 deposited in that bank in the account under the name of Aspen Unlimited, and $ 30,000 of cash withheld from checks on deposit slips to those two accounts. In 1986 petitioners received gross income from their logging business in the total amount of $ 461,667.18, which consisted of $ 447,917.18 deposited in the account in the name of Timber Associates and $ 13,000 of cash withheld from checks deposited in that account, and $ 750 of miscellaneous income. On the Schedules C attached to the returns filed by petitioners for the years 1985 and 1986 total gross income in the amounts of$ 506,000 and $ 213,550, respectively, was reported. The gross receipts as reported on the 1985 return consisted of $ 191,000 deposited to one of petitioners' joint checking accounts in their individual names and $ 315,000 *43 of a deposit of $ 325,000 to the other joint checking account in petitioners' individual names. The 1986 amounts reported consisted of $ 166,000 deposited to one of petitioners' individual joint checking accounts, $ 1,500 designated "T.A. Revenue", $ 6,050 from the sale of trucks, and $ 40,000 of unexplained items. Petitioners reported no taxable income for either year after having taken a $ 190,000 claimed bad debt deduction in 1985 and a $ 45,000 claimed bad debt deduction in 1986. In late 1987 petitioners' 1985 and 1986 returns came to respondent's Durango, Colorado, office for a field audit. Agent Todd Rodas was the agent assigned to conduct the audit. These returns were sent to Mr. Rodas for investigation because in prior years petitioners had taken deductions on their returns involving a tax shelter "Snuggery, Inc.", and also because of the large claimed deductions for bad debts in 1985 and 1986. There had been some correspondence between petitioners and the internal revenue service center prior to the returns being assigned to Mr. Rodas for investigation. On November 5, 1987, Mr. Rodas telephoned Mrs. Lively and informed her that he would be examining petitioners' 1985 *44 and 1986 joint returns. He stated to her that he needed to set up an appointment with her and to examine petitioners books and records. Mrs. Lively stated that she would get a representative and give a power of attorney to that representative. On November 6, 1987, Mr. Rodas sent Mrs. Lively a letter stating that petitioners' 1985 and 1986 returns had been selected for audit and attached to this letter a document request. On December 8, 1987, Mr. Rodas was contacted by Mr. Jerry McComb, a certified public accountant (C.P.A.), who presented a power of attorney to Mr. Rodas to represent petitioners. On December 16, 1987, Mr. Rodas met with Mr. McComb to start the audit of petitioners' 1985 and 1986 returns. Mr. Rodas again met with Mr. McComb on December 21 and 22, 1987, and on these latter two visits actually started getting into the books and records of petitioners that Mr. McComb had. After the first meeting with Mr. McComb, Mr. Rodas gave Mr. McComb a document request. At the first meeting between Mr. Rodas and Mr. McComb the records presented to Mr. Rodas were primarily canceled checks stacked into various piles. After Mr. Rodas examined these documents, it was obvious *45 to him that there were missing records, since the checks did not cover all the items which would normally be expected to be involved in a small business of logging. Mr. Rodas had audited other cases involving logging businesses. Mr. Rodas, in his document request to Mr. McComb, stated that he wanted all records for any entities with which petitioners were doing business or with which they were associated. Since the bad debt deduction taken on the return was a write-off of a purported debt to a corporation that petitioners owned, Mr. Rodas inquired about the corporation and was not satisfied with the answer he received. Mr. Rodas, after leaving Mr. McComb's office, went to the address given for the corporation and found that there was no corporation by that name at the address given. Therefore, he went to the county records office to try to determine who owned the property used as an address by the corporation. In researching the county records, Mr. Rodas found that petitioners had transferred properties into an entity entitled "Par Husan Ventures" and also had transferred property into an entity denominated "Par Shalom" as well as other names of purported entities. The next *46 day Mr. Rodas called Mr. McComb and stated that he wanted all the records including the records of any entities that were trusts or any other type of entity with which petitioners might have been associated. On January 16, 1988, Mr. Rodas received a letter from Mrs. Lively stating that she wanted the audit transferred. Mr. Rodas told Mrs. Lively that she would have to write a letter stating the reason she wanted the audit transferred and after receiving such a letter, the request would be acted on. In March 1988 Mr. Rodas received a letter from Mrs. Lively stating that she wanted the case transferred. Mr. Rodas responded to Mrs. Lively's letter stating that the case would not be transferred since the records needed to audit the 1985 and 1986 returns were in petitioners' possession and petitioners had knowledge of the various entities with which they were dealing. Between the time in January when Mrs. Lively first requested a transfer of the case and the letter she wrote in March, there had been a change in the representative who held petitioners' power of attorney. On March 11, 1988, Mr. Rodas contacted the current person holding petitioners' power of attorney, a Mr. Hernandez. *47 Mr. Hernandez was a representative of a group known as Advance Tax Representation. After Mr. McComb had met with Mr. Rodas, he contacted Mrs. Lively to inform her about the request for documents made by Mr. Rodas. Mrs. Lively had been to a Nassau group seminar in Florida and at the suggestion of someone connected with Nassau, had decided to have Advance Tax Representation represent petitioners in the audit. Mr. Hernandez was from Albuquerque, New Mexico. In March 1988, Mr. Rodas had issued a summons to Navaho and had received records from Navaho. It was from the Navaho records that Mr. Rodas discovered the name Timber Associates and Aspen Unlimited and discovered that checks were being drawn to those names by Navaho and deposited to accounts under those names. Through the Navaho checks he discovered that there were bank accounts in the names of Timber Associates and Aspen Unlimited. Also about this time Mr. Rodas received some material from the Internal Revenue Service (IRS), Criminal Investigation Division in Denver. The documents received by Mr. Rodas in March 1988 were some microfiche records, which the Criminal Investigation Division had obtained through a seizure in *48 Clearwater, Florida, from Nassau Life Insurance Company. Since the Criminal Investigation Division was not interested in the records pertaining to Mr. and Mrs. Lively, they gave them to Mr. Rodas to use in connection with his case. Contained in these records were references to several trusts with different names and a flow chart of how monies moved from one entity to another and some correspondence. From these records, Mr. Rodas discovered the names of additional bank accounts over which petitioners had control. He then took a list of all of the various names he had of bank accounts controlled by petitioners and checked with the IRS service center to determine if any of these entities had filed returns. Later, another check in this regard was made by an appeals officer in the Denver office. Both checks showed that neither Timber Associates, Aspen Unlimited, or any of the other entities, the names of which Mr. Rodas had uncovered, had filed returns. In fact, returns listing Aspen Unlimited as a foreign trust located in Grand Turk, British West Indies, had been prepared for a number of years including the years 1985 and 1986. These returns had been prepared on Forms 1040NR and *49 reported no taxable income because of income distribution deductions. These returns had been seen by Mrs. Lively, but had not been filed. Mrs. Lively, after looking over the returns, had sent the originals to the foreign trustee. Returns for a number of years including 1985 and some prior years had been prepared under a name Par Haram Limited, Grand Turk, British West Indies, and seen by Mrs. Lively but not filed. Similarly, returns under the name Timber Associates of Grand Turk, British West Indies, had been prepared for a number of years including the years 1987, 1985, and prior years but not filed. Mrs. Lively had reviewed these returns and sent the originals to the foreign trustee. These returns all reported no income because they showed income distributions of approximately the same amounts as the income shown. Shortly after Mr. Rodas requested from Mr. Hernandez records with respect to the various entities the names of which he had obtained, there was a change in the individual who held petitioners' power of attorney from Mr. Hernandez to a Mr. Tom Solga, who was also connected with Advance Tax Representation. Mr. Solga was from Farmington, New Mexico. Mr. Rodas requested *50 Mr. Solga to arrange for a meeting between him and petitioners. He wanted to have the meeting to obtain the information he had requested in his document requests to the various representatives of petitioners and to obtain some information about the various entities whose names he had discovered. Prior to this meeting, Mr. Rodas issued two document requests to petitioners asking for various documents with respect to the various entities the names of which he had discovered. The second of these document requests was issued on May 18, 1988, and the meeting date between petitioners and Mr. Rodas was June 8, 1988. However, on April 29, 1988, Mr. Rodas had issued or caused to be issued summonses to all of the banks in Dolores, Mancos, and Cortez, Colorado. There were ten different summonses. These summonses requested all records concerning any bank accounts on which either Mr. or Mrs. Lively had signature authority. After issuing these summonses, Mr. Rodas went to the bank the morning the records were due to be produced and was informed that Mrs. Lively had been to each of the banks earlier and stated to a bank official that she did not want the bank to release the records. The *51 banks therefore did not release the records to Mr. Rodas and he had a summons enforcement proceeding instituted. On May 24, 1988, petitioners had filed in the United States District Court for the District of Colorado where the summons proceeding was pending a "Petition to Quash IRS Summons." This action was filed by petitioners pro se. The petition sought to quash summonses to Valley National Bank, Cortez, Colorado, First National Bank, Cortez, Colorado, and Mancos Valley Bank, Mancos, Colorado. The petition stated that on November 6, 1987, petitioners were notified by mail that the Forms 1040 filed by them for the years 1985 and 1986 were under examination, that "Records were supplied by the petitioners to IRS Agent Rodas in a timely manner as requested." The petition stated that a determination had not been supplied to petitioners and petitioners had not been notified by Agent Rodas that any other company, which petitioners may or may not have knowledge of, is under examination at this time. By order dated October 26, 1988, the petition to quash the summonses was dismissed and the summonses were ordered enforced and, pursuant to this order, Agent Rodas received the documents *52 summoned from the various banks and proceeded to do an examination based on the records he received. At the meeting that Mr. Rodas held with petitioners, which was also attended by their representative, Mr. Tom Solga, Mr. Rodas requested various records of the entities whose names he had discovered. No such records were produced, and petitioners indicated to Mr. Rodas that they had no control over these various entities and no access to the records or control over the records. In response to questions from Mr. Rodas, petitioners did not inform him of the nature of the various entities whose names he mentioned or their connection with these entities. This conference between Mr. Rodas and petitioners lasted several hours. Mrs. Lively knew as early as 1983 that Mr. Lowell G. Anderson, Mrs. Carolyn A. Anderson, Mr. Arthur P. Tranakos, Mr. William Pilgrim, Mr. Donald Barenson, Mr. Donald Perry, and Mr. Ronald Max Ellsworth, who composed the Anderson group and Nassau, and the First Colonial Trust Co. Ltd., had been indicted for conspiracy to defraud the United States by obstructing the functions of the IRS in the ascertainment, computation, assessment, and collection of income taxes *53 in violation of Title 18 U.S.C. sec. 371 (1988). Although Mrs. Lively did not know precisely the terminology of the indictment she was aware that the indictment was of members of the Anderson group whose seminars she had been attending and whose advice she had been following. Mr. Donald Perry had prepared petitioners' tax returns after the late 1970s when they became involved with the Anderson group, but did not sign those returns as preparer. Mrs. Lively knew about the various legal proceedings in connection with this indictment and the final conviction of some of the participants in the Anderson group in early 1989. Although Mrs. Lively was aware at least by 1983 of legal actions involving individuals associated with the Anderson group and Nassau she never consulted any accountant or lawyer outside of the ones associated with these groups to obtain any advice with respect to the legality of not reporting income that was deposited in an account under a name which she had called a trust. Mrs. Lively at sometime during the period here involved served as an information officer for the Nassau group and, as such, set up a seminar and was paid commissions for selling trusts to persons *54 who attended the seminar. Mr. Lively also attended some of the meetings and seminars of the groups of promoters of the foreign trust schemes which were attended by Mrs. Lively between 1979 and 1988. Respondent in his notice of deficiency mailed on September 14, 1989, determined petitioners' income tax, including income and deductions, from the various records obtained from his subpoenas of bank accounts and other documents. Respondent also determined additions to tax for fraud under section 6653(b)(1) and (2) for 1985 and section 6653(b)(1)(A) and (B) for 1986. OPINION Section 6653(b)(1) for 1985 and section 6653(b)(1)(A) for 1986 provide for an addition to tax if any part of an underpayment is due to fraud in the amount of 50 percent for 1985 and 75 percent for 1986. Section 6653(b)(2) for 1985 and section 6653(b)(1)(B) for 1986 provide for an addition to tax of 50 percent of the interest due on the portion of the underpayment due to fraud. The burden to prove fraud by clear and convincing evidence is on respondent. Sec. 7454(a); Hebrank v. Commissioner, 81 T.C. 640, 642 (1983). In order to discharge this burden respondent must not only prove that an *55 underpayment exists but must also prove that a part of that underpayment is due to fraud. A taxpayer's fraudulent intent to evade taxes which he knew to be owing may be shown by evidence of intent to conceal, mislead, or otherwise prevent the collection of taxes. Parks v. Commissioner, 94 T.C. 654, 664 (1990). As has been pointed out on numerous occasions, fraud is intentional wrongdoing on the part of a taxpayer who has the specific intent to evade a tax he knows to be owing. Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Estate of Pittard v. Commissioner, 69 T.C. 391, 400 (1977). In the instant case it is clear that petitioners underpaid their taxes for both 1985 and 1986. The parties have stipulated to this fact. It is also clear that petitioners omitted from income large amounts of income received from Mr. Lively's business, a fact also stipulated to by the parties. It is also clear from the record that although the receipts from Mr. Lively's business were deposited in accounts under the names of Timber Associates and Aspen Unlimited, these monies were subject *56 to petitioners' control, were withdrawn by petitioners, and were used by them as they saw fit. As Mrs. Lively testified, some of the withdrawn funds were used for operations of the business. In fact the business expense deductions taken by petitioners on their returns were increased in respondent's determination and in the agreed amount of tax as set forth by the parties in their stipulation. However, even after the increased expense deductions for 1985, there remains a very substantial understatement not only of receipts but also of income from amounts that were received by petitioners in their business and not reported. For the year 1986 there were substantial unreported receipts, but also substantial amounts of deductions allowable to petitioners, which they did not claim. In fact it appears that if the $ 45,000 bad debt deduction which petitioners claimed in 1986 had been allowable, there would have been no underpayment by petitioners in 1986. The parties agree that although the $ 45,000 claimed bad debt deduction is not properly allowable to petitioners in 1986, this item was not fraudulently taken on the return and is not a fraud item. On the basis of this record, we *57 conclude that regardless of the concealment of records and other fraudulent activities on the part of Mrs. Lively, which we will discuss later, the evidence is not clear and convincing that any part of the underpayment in 1986 was due to this fraud on the part of Mrs. Lively. The $ 45,000 disallowed bad debt deduction is not a fraud item and, except for the disallowance of this claimed deduction, it is not clear that there would be an underpayment in 1986. We therefore conclude that respondent has failed to show fraud on the part of either petitioner in 1986. We have weighed the evidence, which respondent contends shows fraud on the part of Mr. Lively. Although some doubts arise as to whether, in fact, he should not have known that the deposit of money in an account which he and Mrs. Lively totally controlled was not a proper method of relieving the receipts from his logging business from income tax, the evidence is not clear and convincing that he thoroughly understood what was transpiring with respect to petitioners' recordkeeping and the income being reported by petitioners. We therefore conclude that respondent has failed to show by clear and convincing evidence fraud on the *58 part of Mr. Lively for either the year 1985 or the year 1986. In our view the evidence is clear and convincing that Mrs. Lively knowingly concealed substantial amounts of income received by petitioners by depositing receipts in accounts under the names of Timber Associates and Aspen Unlimited. She attempted to conceal these accounts from respondent's agent and denied knowledge of them. Mrs. Lively admitted that the so-called foreign trusts were set up so that monies could be put into an account in the name of one entity and transferred to various other entities with the result that no tax was paid on it by anyone. When she was questioned, she could not explain how this could be proper but claimed that returns had been filed which would disclose how it could properly happen. However the record shows that the returns prepared in names of various trusts were never filed. Mrs. Lively claimed that it was the responsibility of the foreign trustee to file these returns and that she had sent the originals back to the trustee for filing. There was no corroboration of her testimony and, in fact, it is reasonably clear that if she had thought such returns were being filed she could have *59 checked on the matter and discovered the situation. Also she would have told respondent's agent about the bank accounts in the names of various so-called trusts rather than attempting to conceal this fact from him. Her actions in failing to disclose the bank accounts in the names of the various entities, of persisting in using representatives suggested by the persons from whom she had obtained the so-called trust packets and using stalling tactics with respect to the examination of petitioners' tax returns, all clearly indicate a fraudulent intent to evade tax on the part of Mrs. Lively. Her explanation of why she did not ask for advice as to the legality of her activities from any person outside of the Anderson group and Nassau until the Spring of 1990 when she knew not only of the indictment of a number of the people involved with these groups, but also knew that the IRS was not recognizing transactions similar to the ones that she was using, was unpersuasive. Her testimony before the Court was evasive and in some instances totally untrue. She claimed that she did not know of records that the IRS wanted and thought all they wanted and asked for were records of the personal *60 joint accounts of petitioners. It is clear from the revenue agent's testimony and the other evidence in the record that Mrs. Lively did know that the agent was attempting to obtain records of the various so-called trusts and that she deliberately attempted to conceal the existence of these records. Also, the fact that Mr. McComb who represented her in the beginning was not called to testify is indicative that he would have confirmed the testimony of Mr. Rodas as to requests for documents. Mr. Rodas testified that Mrs. Lively was specifically asked for documents that she concealed and did not furnish. Based on the record as a whole, we conclude that a part of the underpayment of tax by petitioners for 1985 was due to fraud on the part of Mrs. Lively. The amount that is due to fraud is the underpayment resulting from all the adjustments except the disallowance of the $ 190,000 of claimed bad debt deduction. Respondent concedes that if we find fraud on the part of Mrs. Lively for 1985, negligence should not be found on the part of Mr. Lively for that year. For the year 1986 we have held that there has not been sufficient showing that a part of the underpayment was due to fraud *61 for us to consider the evidence in this regard clear and convincing. However, we do consider that respondent has established that a part of the underpayment for 1986 was due to negligence. Petitioners negligently kept poor books, did not properly prepare returns from the books they kept, and concealed from respondent documents necessary to properly determine their tax liability. We found in accordance with the stipulation of the parties that any underpayment due to the disallowance of the $ 45,000 bad debt in 1986 was not due to fraud. There is no stipulation with respect to whether this amount of this underpayment was due to negligence. However, since respondent affirmatively alleged negligence in his answer in this case, the burden is on him to show negligence. We conclude as to the section 6653(a)(1)(B) addition that respondent has not shown that the part of the underpayment due to the disallowance of the $ 45,000 bad debt deduction in 1986 is due to negligence. Petitioner has made no showing of error in respondent's determination of the additions to tax for substantial understatement in 1985, and we, therefore, sustain respondent's determination. Respondent on brief concedes *62 that there is no addition to tax under section 6661 for 1986. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩