JOSEPH F. BIANCONE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Biancone v. Commissioner
Docket No. 5151-76.
United States Tax Court
T.C. Memo 1979-94; 1979 Tax Ct. Memo LEXIS 431; 38 T.C.M. (CCH) 446; T.C.M. (RIA) 79094; March 19, 1979, Filed *431 The Commissioner recomputed P's income using the bank deposits method. Such method revealed that P had substantial unexplained bank deposits from 1966 through 1972, and based thereon, the Commissioner determined that there were deficiencies in P's income taxes for such years and that part of the underpayments were due to fraud. Held: (1) P grossly understated his income each year from 1966 through 1972; (2) the allowable dependency deductions determined; and (3) some part of the underpayment for each of the years at issue was due to P's fraud with intent to evade tax within the meaning of sec. 6653(b), I.R.C. 1954. Lee Mandell, for the petitioner. Lowell F. Raeder, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioner's Federal income taxes: Addition
Sec. 6653(b) Year
Deficiency
I.R.C. 1954 [1]
1966
$ 7,684.84
$3,842.42
1967
15,192.10
8,048.27
1968
18,175.64
9,087.82
1969
16,337.95
8,168.97
1970
5,942.32
2,971.16
1971
2,458.37
1,229.18
1972
5,250.73
2,625.36
The issues for decision *432 are: (1) Whether the petitioner understated his income during each of the years in issue; (2) whether the petitioner is entitled to the dependency deductions claimed by him; and (3) whether any part of the underpayment of taxes for the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found.
The petitioner, Joseph F. Biancone, maintained his legal residence in Reading, Pa., when he filed his petition herein.He filed his Federal income tax returns for 1966, 1967, 1968, 1969, 1970, 1971, and 1972 with the Internal Revenue Service Center, Philadelphia, Pa.
In approximately 1960, the petitioner obtained his license to write bail bonds and went into business for himself on a full-time basis. Before he was allowed to actually write any bail bonds, he was required by the insurance company to put up an amount of money as security. Thereafter, the insurance company required him to place 3 percent of the amount of bail he wrote into a "build-up" fund to cover any forfeitures on the bonds. The petitioner sent 2 percent of that build-up fund directly to the insurance *433 company, and he deposited the remaining 1 percent in his account at the New Home Savings & Loan Association, with an independent third party as trustee for the account. From approximately 1967 through 1969, the petitioner had an "arrangement" with a local district attorney who aided him in his bail bond business by requesting the setting of high bails. The petitioner was the only bail bondsman in his area at the time, and anyone who needed the services of a bondsman went to him. He stopped writing bail bonds sometime in 1970 or 1971. Before the petitioner went into the bail bond business, he worked for an auto-wrecking business owned by his father. The petitioner's father ran the business himself and had no partners, but the petitioner owned the garage in which the business was located, as well as one parcel of land used by the business. In 1963, the petitioner's father had a heart attack, and thereafter, the petitioner helped his father run the business while he continued in his own business of writing bail bonds. His father died on December 24, 1966, and during 1967 and 1968, the petitioner was liquidating the business for his mother. The process of liquidating his father's *434 auto-wrecking business included selling the cars at an auction. Such cars were old, in need of repair, and had a great deal of mileage on them; they were commonly referred to in the trade as "junkers." At the time of his father's death, there were between 1,300 and 1,900 junkers to be sold. Although a notary at the auction kept a record of the titles transferred, the petitioner maintained no bills of sale, nor any receipts or cancelled checks, which showed the price for which the cars were sold. He also kept no record of the expenses of liquidating the business. Although his father had maintained a bank account for his business, the petitioner did not deposit the proceeds from the liquidation in such account. On October 4, 1965, the petitioner purchased property known as the Exeter Township property for $1,311.50; he sold such property on June 28, 1972, for $3,898.00. On April 10, 1970, the petitioner purchased property at 543 N. 8th St., Reading, Pa., for $3,462.50; on May 7, 1971, he sold such property for $6,500.00. The petitioner purchased property known as the Leesport property on June 10, 1969, for $18,821.00 and sold it on June 20, 1972, for $49,521.70. The petitioner *435 failed to report any gain from the sale of the Exeter Township and N. 8th St. properties, and he incorrectly reported the gain from the sale of the Leesport property. Toward the end of 1969, the petitioner began to receive income from rental properties owned by him. All of such properties were in a ghetto area, and all of his tenants were on welfare. The petitioner reported no rental income for 1969, but he did report rental income of $2,130.00 for 1970, $3,965.00 for 1971, and $5,216.20 for 1972. The petitioner received interest income during 1971 and 1972 as follows: Source
1971
1972
Thomas Frizzell
$188.94
$304.58
New Home Savings & Loan
Association
599.86
435.63
None of such interest was reported by the petitioner, except for the payment in 1971 from New Home Savings & Loan Association. During the years in issue, the petitioner made several trips to Las Vegas for purposes of gambling. While he was on such trips, he did not pay for his plane fare or lodging since "Everything would be complimentary." The petitioner often played poker with some of his acquaintances at his Leesport property during some of the years in issue. Throughout the years in issue, the petitioner maintained five *436 bank accounts, and the amounts deposited to each account for the years 1966 through 1972 were as follows: Account
Year
Amount
Elverson National Bank
1966
$ 26,575.61
acct. No. 110-102-1
1967
39,359.65
(Elverson checking
1968
54,151.58
account)
1969
31,284.84
1970
21,576.54
1971
20,980.50
1972
15,095.59
$209,024.31
Elverson National Bank
1972
$ 33,389.52
acct. No. 699
(Elverson savings
account)
American Bank & Trust
1966 $ 9,272.76
Co. of Pa. (American)
1967
4,442.08
1968
1,074.98
1969
30,364.06
1970
12,419.00
1971
6,350.00
1972
28,105.00
$ 92,027.88
New Home Savings & Loan
1966 $ 754.79
Association (New Home)
1967
1,723.15
1968
3,692.94
1969
5,162.74
1970
1,920.37
1971
599.86
1972
435.63
$ 14,289.48
National Central Bank
1968 $ 5,059.28
(National)
1970
8,746.76
1971
10.46
1972
1.38
$ 13,817.88 Although the petitioner is not married, he has lived with Mary Wann for over 17 years and considers her to be his common-law wife. Ms. Wann began writing bail bonds in the fall of 1971. Her gross receipts of $28,025.50 for 1971 and $27,760.00 for 1972 represent her commission of 65 percent of the total amounts that she received from her clients. The remaining 35 percent was sent to the insurance company. Ms. Wann had not been employed before she began in *437 the bail bond business. She maintained her own bank account during 1971 and 1972. On his income tax returns for 1966 through 1970, the petitioner claimed three personal exemptions, one each for himself, his son, and his mother. On his returns for 1971 and 1972, he claimed two personal exemptions, one for himself and one for his son. The petitioner's son was 12 years old in 1966. The petitioner furnished the clothing for his son and paid the household expenses. The property where they resided belonged to his mother, and she had independent income and paid her own expenses. The petitioner's tax returns for the years 1966 through 1972 were audited by a revenue agent. A bank deposits analysis for such years revealed that such deposits greatly exceeded the petitioner's income as reported on his tax returns. In explaining the discrepancies, the petitioner told the revenue agent that the amounts deposited in the bank accounts represented various loans, transfers of funds, rental checks which he cashed for his tenants, and money he received from his mother. He also claimed that some of the deposits were the result of writing checks to cash and then depositing the cash later, and that *438 some deposits were made by Ms. Wann from income she received in her business as a bail bond writer. The petitioner also informed the agent that part of the deposits represented money he received from the sale of the garage used by his father's business, but he never told the revenue agent that the deposits were proceeds from the liquidation of such business. The petitioner stipulated that during the years in issue, he received no gifts, inheritances, legacies, or devises. In investigating the petitioner's contentions, the revenue agent discovered that some of the deposits were indeed loans and transfers of funds from one account to another, and he accordingly reduced the total deposits by those amounts. He also reduced the totals by $6,000, which he verified as a loan from the petitioner's mother, and by $5,000, which represented the return of the petitioner's capital from the sale of the garage. The agent also reduced the totals by the amount of checks written to cash and by all checks that were written to Ms. Wann, since he assumed that such checks might be repayments of funds she had given the petitioner. However, the agent did not give the petitioner credit for cashing his *439 tenants' welfare checks, since he had already given him credit for checks written to cash. In the course of his audit, the revenue agent discovered that the petitioner incurred expenses greater than those claimed on his tax returns, and the agent accordingly gave the petitioner credit for expenses in excess of those he reported. The petitioner also told the revenue agent that he gambled but kept no record of his gambling activities. In his notice of deficiency, the Commissioner increased the petitioner's gross receipts by all the bank deposits that were unaccounted for by the revenue agent and by the unreported interest and gains he received upon the sale of his properties. He also allowed the petitioner to claim only one personal exemption for each of the years in issue, and after an adjustment for increased business expenses as determined by the revenue agent and other miscellaneous adjustments to gross income, the Commissioner determined the petitioner's corrected taxable income. The petitioner's taxable income as reported, his taxable income as corrected by the Commissioner, and the understatement of his taxable income are as follows: Taxable Income
Corrected
Understatement of Year
Reported on Return
Taxable Income
Taxable Income
1966
0
$ 22,497.89
$ 22,497.89
1967
$ 4,240.80
38,672.87
34,432.07
1968
6,685.55
42,653.38
35,967.83
1969
8,2 57.94
39,801.56
31,543.62
1970
6,144.28
21,383.27
15,238.99
1971
0
9,133.48
9,133.48
1972
0
19,143.06
19,143.06
Total
$25,328.57
$193,285.51
$167,956.94
OPINION *440 The first issue is whether the petitioner had unreported income during each of the years in issue. The Commissioner reconstructed the petitioner's income during such years by using the bank deposits method. Under such method, the Commissioner added all of the petitioner's bank deposits during each of the years in issue, and from these totals, he subtracted the previously accounted for income and all items which were duplicative and which did not represent income to the petitioner. After adjustments to the petitioner's business expenses and other miscellaneous items, the Commissioner determined that the remaining bank deposits represented the petitioner's unreported income.See, generally, R. Schmidt, "Reconstruction of Income," 19 Tax L. Rev. 277 (1963). The use of the bank deposits method of computing income has long been sanctioned by the courts as a method of reconstructing income. See, e.g., Goe v. Commissioner,198 F. 2d 851 (3d Cir. 1952), affg. a Memorandum Opinion of this Court, cert. denied 344 U.S. 897 (1952); Halle v. Commissioner,175 F. 2d 500 (2d Cir. 1949), affg. 7 T.C. 245 (1946), cert. denied 338 U.S. 949 (1950); Mauch v. Commissioner,113 F. 2d 555 (3d Cir. 1940), *441 affg. 35 B.T.A. 617 (1937); Oliver v. United States,54 F. 2d 48 (7th Cir. 1931), cert. denied 285 U.S. 543 (1932). It is a well established principle that the Commissioner's deficiency determination is presumptively correct and that the petitioner has the burden of proving otherwise. Rule 142, Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). A deficiency determination based on the bank deposits method of reconstructing income is entitled to such presumption, and the petitioner bears the burden of proving that such determination is incorrect. Armes v. Commissioner,448 F. 2d 972 (5th Cir. 1971), revg. on other issues a Memorandum Opinion of this Court; Estate of Mason v. Commissioner,64 T.C. 651, 656-657 (1975), affd. 566 F. 2d 2 (6th Cir. 1977); Jones v. Commissioner,29 T.C. 601 (1957). The petitioner does not question the propriety of using the bank deposits method to reconstruct his income, and he concedes that he deposited the amounts determined by the Commissioner. Instead, the petitioner claims that most of such amounts are not income to him during each of the years in issue. He contends that the deposits resulted from the proceeds of *442 the following transactions: Amount Source
Account
Year
Deposited
Proceeds from liqui-
Elverson
1966
$ 26,575.61
dation of father's
checking
1967
39,359.65
auto-wrecking business
1968
54,151.58
American
1968
643.27
Total
$120,730.11
Tenants' checks cashed
Elverson
1970
$ 21,576.54
and receipts from Ms.
checking
1971
20,980.50
Wann's business
1972
15,095.59
American a
1970
12,419.00
1971
6,350.00
1972
28,105.00
Total
$104,526.63
Security fund for bail
New Home
1966 $ 754.79
bond business, includ-
1967
1,723.15
ing interest
1968
3,692.94
1969
5,162.74
1970
1,920.37
1971
599.86
1972
435.63
Total
$ 14,289.48
Based on the entire record, we find no merit in any of the petitioner's contentions. The petitioner first contends that the Elverson checking account deposits during the years 1966 through 1968 were monies received from the liquidation of his father's business. He claims that after he paid for the expenses *443 of the business, he gave all the proceeds to his mother in cash.He maintains that he obtained the cash by either writing a check to cash or to Ms. Wann, who cashed it. At the outset, we point out that any such proceeds which were delivered to his mother in cash have been eliminated from the Commissioner's computation of unreported income, since the revenue agent reduced the total deposits by checks written to cash or to Ms. Wann. Moreover, the petitioner kept no books or records or any other documents to substantiate his contention. He introduced no evidence which established the prices received for the cars at the auction. He did state that at the time of his father's death, there were between 1,300 and 1,900 junkers on the lot and that "at that time scrap was so low that you couldn't even give them away"; yet, he contends that $120,730.11 in deposits resulted from these sales. For such reasons, we are not persuaded by the petitioner's testimony. The petitioner's next contentions relate to the Elverson checking account and the American account for the years 1970 through 1972. He claims that such deposits resulted from the welfare checks of his tenants which were cashed by him *444 or Ms. Wann when they collected the rents. According to the testimony of the petitioner and Ms. Wann, he gave her $300 or $400 in cash at the beginning of the day. When she collected a rent, she accepted the tenant's welfare check, subtracted the amount of the rent, and gave the tenant the balance in cash. According to their testimony, Ms. Wann took the check to the bank, deposited it and received more cash from the bank, and then returned to collect the rent of the next tenant. He contends that most of the checks were deposited in the Elverson checking account and that a few were deposited in the American account. Therefore, the petitioner concludes that the deposits represent nothing more than the welfare checks he cashed for his tenants with his reported business income. We must reject this testimony for a simple arithmetical analysis shows it to be patently unconvincing.Even if Ms. Wann did as they stated, the total deposits for the day represented the amount of cash with which Ms. Wann started plus the amount of rent collected. Such rent obviously is income to the petitioner, and the cash with which Ms. Wann started must either have come from checks to cash which have been *445 eliminated from the total deposits or from unreported business income. Moreover, the number, frequency, and amount of deposits in the Elverson checking and American accounts do not reflect a consistent pattern which one would expect from collecting rents and cashing checks in connection therewith. We are also hardpressed to believe that Ms. Wann went through such a time-consuming procedure each time she collected a rent. The petitioner also claims that the amounts deposited in the Elverson checking and American accounts in 1971 and 1972 included the gross receipts from Ms. Wann's bail bond business. However, neither the petitioner nor Ms. Wann introduced any evidence to substantiate this contention. Furthermore, the revenue agent reduced the total deposits by all checks made out to Ms. Wann since such checks might represent repayments of any funds she might have deposited into the petitioner's accounts. Thus, the petitioner's attempted explanation of the deposits in the Elverson checking and American accounts is unconvincing. The petitioner also claims that the amounts deposited in the New Home account during the years 1966 through 1970 are not income to him since they represent *446 amounts deposited as security for his bail bond business, and that the amounts deposited during 1971 and 1972 merely represent interest on the security deposits. First of all, the $435.63 interest he received from New Home in 1972 represented income to the petitioner and should have been reported as such. Sec. 61(a)(4). We recognize that he properly reported the $599.86 he received in 1971. As to the amounts deposited during 1966 through 1970 which the petitioner claims represent a build-up as security against bail forfeitures, such amounts are part of his commissions for the writing of bail bonds and constitute gross income reportable by him. It is well established that amounts set aside for contingent liabilities may not be excluded from income. Brown v. Helvering,291 U.S. 193, 199 (1934); Lucas v. American Code Co.,280 U.S. 445 (1930). Hence, the petitioner's contentions as to the New Home account are also unpersuasive. As for the deposits made to the National account during 1968 through 1972, the American account during 1966 through 1969, [2] the Elverson checking account during 1969, and the Elverson savings account during 1972, the petitioner either had no explanation *447 for these deposits or admitted they were income to him. In addition, there are reasons to question the accuracy of the income reported by the petitioner. He stated that he was on "excellent terms" with a local district attorney who aided him in his business by arranging to have high bails set. The petitioner testified that he had a disagreement with the attorney because he thought that the petitioner was making "too much money," and because the attorney wanted to get a "racketeer" friend of his into the business of writing bail bonds. According to the petitioner, this arrangement with the district attorney existed sometime during the years 1967 through 1969. Yet, he reported net income from his business of only $6,712.00 in 1967, $9,217.39 in 1968, and $12,053.43 in 1969. Such income is not that of a person making "too much money." Moreover, some of these deposits may have resulted from proceeds of the petitioner's gambling activities which he admitted occurred regularly. Accordingly, we hold that the petitioner has not met his burden of establishing *448 that the Commissioner's determination of unreported income was incorrect. See Shahadi v. Commissioner,266 F. 2d 495 (3d Cir. 1959), affg. 29 T.C. 1157 (1958), cert. denied 361 U.S. 874 (1959); Anderson v. Commissioner,250 F. 2d 242 (5th Cir. 1957), affg. on this issue a Memorandum Opinion of this Court, cert. denied 356 U.S. 950 (1958). The next issue we must consider is whether the petitioner is entitled to the dependency deductions which he claimed for his mother and son for the years 1966 through 1970 and for his son for the years 1971 and 1972. The petitioner bears the burden of establishing that he is entitled to the dependency deductions which he claims. Rule 142(a), Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). His son was a minor during all of such years, and we have no reason to doubt the petitioner's testimony that he furnished virtually all of the support for his son during such years. We are satisfied that the petitioner is entitled to the dependency deduction for his son. However, we are not convinced that the petitioner is entitled to a dependency deduction for his mother. The petitioner produced no evidence as to the precise *449 amount of her support or the amount provided by him. We do know that his mother owned the house in which they resided and that she had income of her own. Under these circumstances, the petitioner has failed to show that he is entitled to claim her as a dependency deduction. The final issue for decision is whether any part of the underpayment of taxes for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b), which provides in part: (b) Fraud.--If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * * The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Levinson v. United States,496 F. 2d 651 (3d Cir. 1974), cert. denied 419 U.S. 1040 (1974); Estate of Pittard v. Commissioner,69 T.C. 391 (1977); Estate of Temple v. Commissioner,67 T.C. 143 (1976); Imburgia v. Commissioner,22 T.C. 1002 (1954); Petit v. Commissioner,10 T.C. 1253 (1948). To *450 establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Webb v. Commissioner,394 F. 2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). The Commissioner need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment is attributable thereto. Otsuki v. Commissioner,53 T.C. 96, 105 (1969). If fraud is established, the 50-percent penalty is imposed, not only on that portion of the underpayment which is the result of fraud, but on the entire deficiency. Sec. 6653(b), (c); Stone v. Commissioner,56 T.C. 213, 220 (1971). The presence or absence of fraud is a factual question to be determined by an examination of the entire record. Mensik v. Commissioner,328 F. 2d 147, 150 (7th Cir. 1964), affg. 37 T.C. 703 (1962), cert. denied 379 U.S. 827 (1964); Otsuki v. Commissioner,supra at 105-106. Since fraud can *451 seldom be established by direct proof of intention, the taxpayer's entire course of conduct can often be relied on to establish circumstantially such fraudulent intent. Stone v. Commissioner,supra at 223-224; Otsuki v. Commissioner,supra at 105-106. Based on the entire record, the evidence overwhelmingly establishes that the petitioner fraudulently underpaid his taxes during each of the years in issue. His returns understated his income by $22,497.89 in 1966, $34,432.07 in 1967, $35,967.83 in 1968, $31,543.62 in 1969, $15,238.99 in 1970, $9,133.48 in 1971, and $19,143.06 in 1972. Such a consistent pattern of under-reporting substantial amounts of income over a period of several years, standing alone, is persuasive evidence of fraud. Holland v. United States,348 U.S. 121, 139 (1954); Adler v. Commissioner,422 F. 2d 63, 66 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court, cert. denied 397 U.S. 962 (1970); Agnellino v. Commissioner,302 F. 2d 797, 801 (3d Cir. 1962), affg. on this issue a Memorandum Opinion of this Court; Shahadi v. Commissioner,266 F. 2d at 500-501; *452 Schwarzkopf v. Commissioner,246 F. 2d 731, 734 (3d Cir. 1957), affg. a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1139 (1970). We recognize that such principle should be applied with caution where the finding of unreported income is based on the taxpayer's failure to meet his burden of proof in some respect. See Otsuki v. Commissioner,supra at 106; Estate of Beck v. Commissioner,56 T.C. 297, 363 (1971). However, our conclusion is not based solely on the petitioner's failure of proof, or his failure to report substantial income, because there are other significant indicia of fraud. The only argument the petitioner makes to refute the fraud penalty is that the deposits were made in the various accounts because of the strong family ties and mutual trust that existed among the members of his family, himself, and his common-law wife. However, the petitioner's course of conduct during the 7 tax years in issue forces us to reject such contention. First of all, there were gains on the sale of property and interest payments which he omitted from income. Furthermore, we are hardpressed to believe that the petitioner, who worked in his father's business before *453 he entered his own business and then again from 1963 until 1968, had no idea of the expenses of running the business or of the gross receipts of the business, as he testified at trial. [3] We also find it hard to believe that he kept no business records during this rather long period, particularly in light of the number of cars on the lot. Moreover, the petitioner never told the revenue agent, during the course of the audit, that the amounts deposited in the Elverson checking account were proceeds from his father's business; the petitioner first made such a contention at trial. Considering the volume of deposits in such account, it seems to us that if there were any truth to this explanation, the petitioner would have remembered it during the course of the audit. Under such circumstances, we have rejected the explanation, and the patent attempt to mislead the Court as to the source of such deposits is evidence of fraudulent conduct on the part of the petitioner. In addition, even the petitioner's counsel had to steer him *454 away from telling another falsehood while testifying. When asked about the Elverson checking account for 1969, the petitioner first stated that the deposits included amounts from his welfare tenants. After his attorney reminded him that he did not report any rental income on his tax return for that year, the petitioner recanted his story and stated that all the deposits were income to him from only his bail bond business. Yet, on his tax return for 1969, the petitioner reported taxable income in the amount of $8,257.94; the Elverson checking account deposits for 1969 total $31,284.84, and the petitioner eventually admitted that such deposits were income. This testimony is another example of his willingness to cover up his fraudulent intent. The petitioner's entire testimony constitutes a pattern of excuses. For the earlier years, there was the story about the liquidation of his father's business and the additions to the security fund. In the later years, there was the story about the depositing of welfare checks. As we pointed out previously, the deposits to the security fund and the cashing of welfare checks represented income so that those stories did not serve to explain *455 the failure to report income. We are left with a series of stories that are either unbelievable or do not explain the failure to report large amounts of income. With so many inconsistencies and contradictions in the petitioner's testimony, it is difficult to know what to believe, but it is clear that such statements were made with the purpose of concealing his unreported income. Accordingly, we find that part of the underpayment for each of the years at issue was due to fraud on the part of the petitioner. In conclusion, we hold that the petitioner had unreported income for the years 1966 through 1972 as determined by the Commissioner; that he is entitled to a dependency deduction for his son, but not for his mother, for each of such years; and that he is liable for the fraud penalty for each of such years. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
a. Ms. Wann testified that most of her gross receipts and most of the tenants' welfare checks were deposited at Elverson, but that some of them were deposited at American. Since there was no evidence as to other sources for the deposits at American in the years 1970, 1971, and 1972, we have set forth all the American deposits for such years.↩
2. The petitioner stated that $643.27 of the amount deposited in this account in 1968 represented proceeds from his father's business.↩
3. After being pressed by the Commissioner's counsel, the petitioner did estimate that the expenses of running the business during 1967 were about $1,500 to $2,000.↩